## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NO.** 22-cv-81294-AMC

In the Matter of the Search of

Mar-a-Lago
1100 S. Ocean Blvd.
Palm Beach, FL 33480

_____/

## <u>MOTION FOR JUDICIAL OVERSIGHT AND ADDITIONAL RELIEF</u>

President Donald J. Trump ("Movant"), through his undersigned counsel, respectfully files this Motion For Judicial Oversight And Additional Relief, which seeks an order that: (a) appoints a Special Master; (b) enjoins further review of seized materials by the Government until a Special Master is appointed; (c) requires the Government to provide a more detailed Receipt for Property; and (d) requires the Government to return any item seized that was not within the scope of the Search Warrant, and states as follows:

## I.     INTRODUCTION

Politics cannot be allowed to impact the administration of justice. President Donald J. Trump is the clear frontrunner in the 2024 Republican Presidential Primary and in the 2024 General Election, should he decide to run.[1] Beyond that, his endorsement in the 2022 mid-term

---

[1] For instance, a June 2022 nationwide poll of Republican primary voters found that 84 percent would support Donald Trump if he ran for President in 2024. McLaughlin & Assoc., *National Survey Results*, at 26 (June 24, 2022), https://mclaughlinonline.com/2022/06/24/ma-poll-national-monthly-june-2022/. President Trump leads the next potential Republican candidate by 44 points, *id.* at 27, and leads the incumbent President by 5 points if a general election were held today. *Id.* at 30. Other polls validate these numbers. *See, e.g.,* Iowans for Tax Relief, "Poll: Iowans like Gov. Reynolds as Biden's Support Slides" (July 21, 2022), https://taxrelief.org/poll-iowans-like-governor-reynolds-as-bidens-support-slides/ (President Trump leads Biden by 11 points); TIPP Insights, "Golden TIPP Poll: President Trump, a formidable candidate in 2023 Republication primaries" (June 24, 2022), https://americanwirenews.com/tipp-president-trump-a-formidable-

elections has been decisive for Republican candidates. On August 8, 2022, in a shockingly aggressive move—and with no understanding of the distress that it would cause most Americans— roughly two dozen Special Agents of the Federal Bureau of Investigation ("FBI"), directed by attorneys of the U.S. Department of Justice (the "Government"), raided the home of President Donald J. Trump. According to the Government, the agents seized documents, privileged and/or potentially privileged materials, and other items—including photos, handwritten notes, and even President Trump's passports[2]—that were outside the lawful reach of an already overbroad warrant. President Trump, like all citizens, is protected by the Fourth Amendment to the United States Constitution. Property seized in violation of his constitutional rights must be returned forthwith.

Law enforcement is a shield that protects Americans. It cannot be used as a weapon for political purposes. Therefore, we seek judicial assistance in the aftermath of an unprecedented and unnecessary raid on President Trump's home at Mar-a-Lago, in Palm Beach, Florida.

From the first moment that the Government informed Movant, through counsel, that a search was underway, he demanded transparency. Movant asked the Government the questions that any American citizen would ask under the circumstances, namely:

- Why raid my home with a platoon of federal agents when I have voluntarily cooperated with your every request?

- What are you trying to hide from the public—given that you requested that I turn off all home security cameras, and even refused to allow my attorneys to observe what your agents were doing?

- Why have you refused to tell me what you took from my home?

candidate-in-2024-republican-primaries/ (President Trump leads the 2024 Republican primary field by 43%).

[2] On August 15, 2022, one week after the items were seized, the Government acknowledged that the seized materials included passports belonging to Movant. Recognizing that the passports were not validly seized, the Government notified counsel for Movant so that they could be retrieved.

As set forth in detail below, the Government has declined to provide even the most basic information about what was taken, or why. However, the scant information the Government has provided—a vaguely-worded Receipt For Property and the warrant itself—raises significant Fourth Amendment questions about this unprecedented and unnecessary raid.

For instance, the Government has informed counsel for President Trump that privileged and/or potentially privileged documents were among the items taken from his home. But the Government has refused to provide any information regarding the nature of these documents. The Supreme Court has held that documents reflecting communications between a President and top advisors are presumptively privileged. *United States v. Nixon*, 418 U.S. 683, 782 (1974). Protecting the integrity of these documents is important not only to Movant but also to the institution of the Presidency.

Significantly, the Government has refused to provide President Trump with *any* reason for the unprecedented, general search of his home. To date, the Government has failed to legitimize its historic decision to raid the home of a President who had been fully cooperative. Instead, faced with public backlash, the Attorney General has taken the unheard-of step of announcing at a press conference that he was willing to release portions of a sealed search warrant application. Government leaks to favored media outlets have provided ever-changing, and inaccurate, "justifications" for the politicized conduct of the FBI and Department of Justice ("DOJ"). These unsupported "justifications" by anonymous sources hint at a breakdown in communications between President Trump's representatives and the Government, or that there developed a need to obtain a search warrant. The actual chronology of events clearly establishes that there was no "exigency" for a forceful raid and there is no basis for keeping information about the raid from the public. Movant therefore requests that the Court order the Government to provide the information

3

sought by this motion, and to take the other measures set forth in detail below, in order to protect Movant's constitutional rights under the Fourth Amendment.

## II.  BACKGROUND

### A.  President Donald J. Trump's Voluntary Assistance

On January 20, 2021, President Trump and his family left the White House. They moved back to their home at Mar-a-Lago in Palm Beach, Florida. Mar-a-Lago is a historic landmark, a mansion with 58 bedrooms and 33 bathrooms on 17 acres of land extending from the Atlantic Ocean to the Intracoastal Waterway—hence the name, which means "sea-to-lake." Consistent with every modern Presidential transition, staff conducted the move on a condensed timeframe. That move, like home moves undertaken by most Americans, involved boxes. It was done during the day, with the boxes in full view.[3]

After President Trump and his family settled back into their home, employees at the National Archives and Records Administration ("NARA") inquired as to whether any documents were inadvertently transferred by the movers to Mar-a-Lago. In January 2022, Movant *voluntarily* asked NARA movers to come to Mar-a-Lago to receive 15 boxes of documents ("15 NARA Boxes") that had been brought by movers to Mar-a-Lago, so that they could be transferred to NARA headquarters in Washington, DC.

On February 8, 2022, NARA made the following public statement:

> Throughout the course of the last year, NARA obtained the cooperation of Trump representatives to locate Presidential records that had not been transferred to the National Archives at the end of the Trump administration. When a representative informed NARA in December 2021 that they had located some records, NARA arranged for them to be securely transported to Washington. NARA officials did not visit or "raid" the Mar-a-Lago property.

---

[3] A photograph typical of the move of boxes accompanies the article found at https://www.npr.org/2022/02/10/1079832165/congressional-panel-will-investigate-trumps-removal-of-white-house-documents.

National Archives, "Press Statements in Response to Media Queries About Presidential Records"

(Feb. 8, 2022), available at https://www.archives.gov/press/press-releases/2022/nr22-001.

Sometime thereafter, NARA employees involved the White House and DOJ in the matter of the

voluntarily returned 15 NARA Boxes. Movant was contacted because the 15 NARA Boxes

contained documents from his Administration that were protected by executive privilege, and

Movant's counsel communicated with representatives of the White House, the DOJ, and NARA

regarding these matters.

On May 11, 2022, Movant *voluntarily* accepted service of a grand jury subpoena addressed

to the custodian of records for the Office of Donald J. Trump, seeking documents bearing

classification markings. President Trump determined that a search for documents bearing

classification markings should be conducted—even if the marked documents had been de-

classified—and his staff conducted a diligent search of the boxes that had been moved from the

White House to Florida. On June 2, 2022, President Trump, through counsel, invited the FBI to

come to Mar-a-Lago to retrieve responsive documents.

The next day, on June 3, 2022, Jay Bratt, Chief of the Counterintelligence and Export

Control Section in the DOJ's National Security Division, came to Mar-a-Lago, accompanied by

three FBI agents. President Trump greeted them in the dining room at Mar-a-Lago. There were

two other attendees: the person designated as the custodian of records for the Office of Donald J.

Trump, and counsel for President Trump. Before leaving the group, President Trump's last words

to Mr. Bratt and the FBI agents were as follows: "Whatever you need, just let us know."

Responsive documents were provided to the FBI agents. Mr. Bratt asked to inspect a

storage room. Counsel for President Trump advised the group that President Trump had authorized

him to take the group to that room. The group proceeded to the storage room, escorted by two

Secret Service agents. The storage room contained boxes, many containing the clothing and personal items of President Trump and the First Lady. When their inspection was completed, the group left the area.

Once back in the dining room, one of the FBI agents said, "Thank you. You did not need to show us the storage room, but we appreciate it. Now it all makes sense." Counsel for President Trump then closed the interaction and advised the Government officials that they should contact him with any further needs on the matter.

On June 8, 2022, Mr. Bratt wrote to counsel for President Trump. His letter requested, in pertinent part, that the storage room be secured. In response, President Trump directed his staff to place a second lock on the door to the storage room, and one was added.

In the days that followed, President Trump continued to assist the Government. For instance, members of his personal and household staff were made available for voluntary interviews by the FBI. On June 22, 2022, the Government sent a subpoena to the Custodian of Records for the Trump Organization seeking footage from surveillance cameras at Mar-a-Lago. At President Trump's direction, service of that subpoena was voluntarily accepted, and responsive video footage was provided to the Government.

**B.**     **Application For Search Warrant**

Despite the voluntary assistance provided by President Trump, the Government took the unprecedented step of requesting a search warrant for his home. The Government sought an expansive and intrusive search of President Trump's office, all storage rooms, and "all other rooms or areas with the premises used or available to the used by [President Trump] and his staff and in which boxes or documents could be stored." Search Warrant, Attachment A [Case 9:22-mj-08332-BER, ECF 17 at 3 of 7]. The Government also sought an expansive definition of property that it

could seize, which included not only responsive documents and associated boxes, but also *"any other containers/boxes* that are collectively stored or *found together with the aforementioned documents* and containers/boxes." *Id.* at 4 of 7[4] (emphasis added). Essentially, the Government secured court authorization to seize boxes that just happened to be located near potentially responsive materials.

The Search Warrant was signed at 12:12 p.m. on Friday, August 5, 2022. Search Warrant [Case 9:22-mj-08332-BER, ECF 17 at 2 of 7]. The Government was given 14 days to execute the Search Warrant. *Id.*

### C.    The Unprecedented Search Of President Trump's Home

Belying any actual urgency, the Government waited three days—until Monday, August 8, 2022—to execute the Search Warrant. Early in the morning on August 8, 2022, a group of roughly two dozen FBI agents gathered on the premises at Mar-a-Lago carrying boxes and other items. At approximately 9:10 a.m., Mr. Bratt telephoned counsel for President Trump and informed him that a group of FBI agents was at Mar-a-Lago to execute a search warrant. Heated discussion ensued as to why the Government did not make a voluntary request to further explore the premises, given the expansive assistance that President Trump had provided to that point.

---

[4] The Affidavit remains under seal. On August 15, 2022, President Donald J. Trump issued a public statement on this, which reads as follows:

> There is no way to justify the unannounced RAID of Mar-a-Lago, the home of the 45th President of the United States (who got more votes, by far, than any sitting President in the history of our Country!), by a very large number of gun toting FBI Agents, and the Department of "Justice" but, in the interest of TRANSPARENCY, I call for the immediate release of the completely Unredacted Affidavit pertaining to this horrible and shocking BREAK-IN. Also, the Judge on this case should recuse!

https://truthsocial.com/users/realDonaldTrump/statuses/108830529259405266 (last visited on August 19, 2022).

Mr. Bratt then made several requests. The first request made by Mr. Bratt was that all closed-circuit television ("CCTV") cameras at Mar-a-Lago be turned off. Pursuant to Mar-a-Lago policy, and in the absence of any court order directing such a measure, this request was declined. Mr. Bratt also requested the names of any attorneys who might arrive at Mar-a-Lago on behalf of President Trump. In turn, counsel for President Trump requested a copy of the Search Warrant and Affidavit in Support, and asked to be provided with a list of anything seized, once the search was completed. Mr. Bratt declined to provide the Search Warrant and Affidavit, stating that after the FBI agents finished their search, President Trump would be provided with a copy of the Search Warrant and a Receipt for Property, but not the Affidavit.

Among other actions taken after being notified of this unprecedented event, counsel for President Trump contacted three attorneys in the general area, who agreed to go to Mar-a-Lago. Once they arrived, they requested the ability to enter the mansion in order to observe what the FBI agents were doing, which the Government declined to permit.

After approximately nine hours, the FBI concluded its search. An FBI agent provided one of the attorneys who had been waiting outside for nearly the full nine hours with a copy of the Search Warrant. The FBI also provided a three-page Receipt for Property. Receipt for Property [Case 9:22-mj-08332-BER, ECF 17 at 5–7 of 7]. That list provided almost no information that would allow a reader to understand what was seized or the precise location of the items.

On August 11, 2022, counsel for President Trump spoke with Mr. Bratt by telephone. The first item of discussion was a message from President Trump to Attorney General Merrick Garland. The message was as follows:

> President Trump wants the Attorney General to know that he has been hearing from people all over the country about the raid. If there was one word to describe their mood, it is "angry." The heat is building up. The pressure is building up. Whatever I can do to take the heat down, to bring the pressure down, just let us know.

In addition, counsel for President Trump asked Mr. Bratt (1) to provide a copy of the Affidavit; (2) to agree to the appointment of a Special Master to protect the integrity of privileged documents; (3) to provide a detailed list of exactly what was taken from President Trump's home, and where it had been located in the mansion; and (4) to allow counsel to President Trump the ability to inspect what had been seized. Mr. Bratt declined these four requests. To end the call, counsel for President Trump requested that all on the call keep the lines of communication open.

### D.   Attorney General Merrick Garland's Press Conference

Just hours after this August 11, 2022, telephone call, Attorney General Merrick Garland took the unusual step of holding a press conference to deliver remarks regarding the search of Mar-a-Lago and the Government's motion to unseal the Search Warrant and Receipt for Property. Mr. Garland made no mention of President Trump's clear and unequivocal message to him. In fact, the Government made no response at all to President Trump's invitation to help reduce public consternation with the Government after the raid. Instead, Mr. Garland stated, in pertinent part:

> Just now, the Justice Department has filed a motion in the Southern District of Florida to unseal a search warrant and property receipt relating to a court-approved search that the FBI conducted earlier this week.

> That search was of premises located in Florida belonging to the former President. The Department did not make any public statements on the day of the search. The former President publicly confirmed the search that evening, as is his right.

> Copies of both the warrant and the FBI property receipt were provided on the day of the search to the former President's counsel, who was on site during the search.

> The search warrant was authorized by a federal court upon the required finding of probable cause. . .

*See* U.S. Department of Justice, "Attorney General Merrick Garland Delivers Remarks" (Aug. 11, 2022), https://www.justice.gov/opa/speech/attorney-general-merrick-garland-delivers-remarks.

He then stated, regarding the issuance and execution of the Search Warrant:

First, I personally approved the decision to seek a search warrant in this matter.

Second, the Department does not take such a decision lightly. Where possible, it is standard practice to seek less intrusive means as an alternative to a search, and to narrowly scope any search that is undertaken.

*Id.*

This public statement is deeply troubling, given that President Donald J. Trump is the clear frontrunner in the 2024 Republican Presidential Primary and in the 2024 General Election, should he decide to run. The statement clearly suggests that the decision to raid Mar-a-Lago, a mere 90 days before the 2022 midterm elections, involved political calculations aimed at diminishing the leading voice in the Republican party, President Trump. All facts laid out herein show that there was complete cooperation between President Trump, his team, and the appropriate agencies. Mr. Garland's remarks stray from long-standing DOJ policy.[5] The decision by the Attorney General to conduct a hastily prepared press conference to announce his intention to release the Search Warrant and Receipt For Property was an ill-founded reaction to the public outcry that followed the raid on President Trump's home.

## III.  ARGUMENT

### A.  The Extraordinarily Unusual Conduct Of The DOJ Raises Fundamental Fourth Amendment Concerns.

The Fourth Amendment to the Constitution of the United States provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

---

[5] *See* U.S. Dep't of Just., Justice Manual § 1-7.400 ("DOJ generally will not confirm the existence of or otherwise comment about ongoing investigations.").

Prior to any indictment, and the availability of various grounds of suppression from evidence at trial, the mechanism that protects the rights of the individual from unreasonable searches and seizures is Federal Rule of Criminal Procedure 41(g). The rule specifically contemplates protecting the rights of citizens who have been "aggrieved by an unlawful search and seizure of property." Even as the Government has dug in against transparency in the instant matter, fighting release of the Affidavit and claiming a redacted version would be "worthless" due to the need to hide the actual substance of the sworn statement, there are significant red flags that implicate President Trump's Fourth Amendment rights and cry out for judicial intervention by way of Special Master monitoring and discovery assistance.

### The Warrant Is Facially Overbroad

Permitting agents to seizes boxes of documents merely because they are physically "found together" with boxes of other items purportedly within the scope of the warrant is clearly overbroad. As instructed by the Supreme Court and the Eleventh Circuit, "[t]he Fourth Amendment requires that 'those searches deemed necessary should be as limited as possible.'" *United States v. Blake*, 868 F.3d 960, 973 (11th Cir. 2017) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). "The 'specific evil' that limitation targets 'is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings.'" *Id.* (citing *Coolidge*, 403 U.S. at 467). Indeed, "[t]hat type of rummaging was permitted during the colonial era by the 'general warrant,'" which the Fourth Amendment is specifically intended to preclude. *Id.*; *see also Payton v. New York*, 445 U.S. 573, 583 (1980) ("It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment.").

Moreover, boxes of personal documents, photographs, and items such as clothing are by definition not "contraband" and thus may not be lawfully seized. In fact, the Search Warrant's broad scope was in violation of the Fourth Amendment's particularity requirement and thus the warrant permitted a "general search," prohibited as unconstitutional since red-coated soldiers created the need for the requirement in the first place.

### The Government Sought To Improperly Evade
### Limitations On Enforcing The Presidential Records Act

The investigation regarding President Trump's return of the 15 NARA Boxes involved a NARA "referral" to the DOJ based on questions relating to documents falling within the Presidential Records Act ("PRA"). But "the PRA accords the President virtually complete control over his records during his term of office." *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991). There is no criminal enforcement mechanism or penalty in the PRA. *See* 44 U.S.C.A. §§ 2201 – 2209. Did DOJ's National Security Division ("NSD") recognize that deficiency, and then decide to re-categorize this case as relating to national security materials—simply to manufacture a basis to seek a search warrant? Relatedly, and importantly, did NSD and the FBI mischaracterize the types of documents it sought to seize as an effort to avoid the lack of enforcement mechanism in the PRA?

### The Government's Reckless Pursuit Of A Search Warrant
### Implicates Well-Established Bases For Suppression Under The Fourth Amendment

Under controlling Supreme Court precedent, a search warrant violates a person's Fourth Amendment rights and is invalid if the affiant either makes material misstatements or makes a material omission in the affidavit. *Franks v. Delaware*, 438 U.S. 154 (1978). Did the DOJ mischaracterize or omit from its Affidavit the true extent of the President's cooperation? Press reports by anonymous Government sources raise this question.

In addition, did the affiant to the warrant fairly disclose any pretextual or "dual" purpose at work in obtaining the warrant? For example, the Receipt for Property largely fails to identify seized documents with particularity, but it does refer to the seizure of an item labelled "Executive Grant of Clemency re: Roger Jason Stone, Jr." Aside from demonstrating that this was an unlawful general search, it also suggests that DOJ simply wanted the camel's nose under the tent so they could rummage for either politically helpful documents or support other efforts to thwart President Trump from running again, such as the January 6 investigation. Interestingly, in the Government's response to motions to unseal the Search Warrant Affidavit, the Government claims public exposure of the Affidavit would "jeopardize" this investigation and *other high-profile investigations*." [Case 9:22-mj-08332-BER, ECF 59 at 8 (emphasis added)]. The phrasing suggests that DOJ has other interests at work than simply collecting documents with classification markings.

Finally, the elements of national security statutes such as those referenced by the Search Warrant, as well as the administrative process of classification and declassification, are complex matters. Did the affiant fully disclose the strictures of these statutes as well as the President's overarching authority to declassify documents? Did the affiant disclose that there are public statements by those with knowledge indicating the documents sought in this search had been declassified? These are the types of material omissions that implicate *Franks* and could establish a clear violation of President Trump's Fourth Amendment rights.

### The Government Has Long Treated President Donald J. Trump Unfairly

The FBI and DOJ have demonstrated a willingness to treat President Trump differently than any other citizen. Two years of noisy "Russian collusion" investigations led to a Special Counsel's finding of biased FBI agents and officials; stories of FBI agents engaging in

"information laundering," where a fired informant continued to feed the FBI false information through a DOJ official to investigate the President; and even an FBI General Counsel lawyer falsifying documents to support a Foreign Intelligence Surveillance Act warrant's penetration into then-candidate Trump's inner circle. An Assistant Director at the FBI was referred to prosecution for lying repeatedly about the Trump probe, and text exchanges between the lead agent (Peter Strzok) and his paramour (Lisa Page) reflect their complete disdain and bias against President Trump and his supporters, while they were entrusted with probing the farcical Russian collusion claims.

Without further information from the Government, President Trump currently has no ability to assess whether any FBI agents involved in the Russia defamation matter are participating with NSD in the current situation. Historically, courts tend to give significant deference to law enforcement representatives who weigh in against non-disclosure of potentially sensitive materials because of "investigative" needs or witness safety. But, in light of recent FBI behavior when President Trump is a part of its aim, this Court should feel obliged to demand candor and transparency, and not just "trust us" assertions from DOJ. The appointment of a Special Master with a fair-minded approach to providing defense counsel with information needed to support any Rule 41(g) filing is an appropriate use of this Court's authority on such sensitive matters.

**B.     This Court Should Appoint A Special Master To Protect Movant's Constitutional Rights.**

Movant requests that this Court appoint a Special Master pursuant to Rule 53(a)(1)(B) of the Federal Rules of Civil Procedure and this Court's inherent equitable powers and authority. This step—which the Government itself has requested in cases involving the seizure of privileged and/or potentially privileged materials—is needed to preserve the sanctity of executive communications and other privileged materials. Furthermore, Movant requests that this Court issue

a protective order enjoining the United States from any further review of the items seized until this Court can rule on the present Motion. *See* Fed. R. Civ. P. 26(b)(5) & (c)(1); S.D. Fla. L.R. 26.1(g). In addition, Movant requests that this Court direct the United States to prepare and provide a specific and detailed Receipt for Property. *See* Fed. R. Crim. P. 41(f). The "Receipt For Property" provided to Movant on August 8, 2022 is so vague and lacking in specificity that the reader does not know what was seized from Movant's home.

### Seized Documents Reflecting Presidential
### Communications With Advisors Are Presumptively Privileged

The documents seized at Mar-a-Lago on August 8, 2022, were seized from President Trump and were created during his term as President. Accordingly, the documents are "presumptively privileged" until proven otherwise. *Nixon*, 418 U.S. at 782. Only an evaluation by a neutral reviewer, a Special Master, can secure the sanctity of these privileged materials.

As a general matter, the likelihood that the Government seized privileged material suggests the need for a careful review process. For example, while there has never been a search warrant executed at the home of a President of the United States, federal regulations acknowledge the delicate nature of reviewing all types of privileged material. Under 28 C.F.R. § 59.4(b)(2), federal officers may seek to search for and seize documents from certain classes of professionals— including lawyers—only after securing the recommendation of the U.S. Attorney and the approval of a Deputy Assistant Attorney General. The message of that guideline is clear—the utmost care must be taken in the seizure of potentially privileged materials.

The present matter undoubtedly involves such materials. During the Clinton presidency, this issue of privilege—specifically, the *presumption* of privilege—was raised in response to a grand jury subpoena directed to White House counsel. *See In re Grand Jury Proc.*, 5 F. Supp. 2d 21 (D.D.C.), *aff'd sub nom. In re Lindsey*, 148 F.3d 1100 (D.C. Cir. 1998), *and aff'd in part, rev'd*

*in part sub nom. In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998). While the context differs from the present case, the court's analysis of the nature of the evidence sought by the grand jury in that case applies with equal strength here. There, the U.S. District Court for the District of Columbia adhered to the Supreme Court's holding pertaining to evidence sought (or seized) from a President: "[W]hen the President of the United States asserts a claim of executive privilege, the district court has a 'duty to . . . treat the subpoenaed material as *presumptively privileged.*'" *Id.* at 25 (quoting *Nixon*, 418 U.S. at 713). Furthermore, if, at the time the documents or materials were created, they "reflect presidential decision-making and deliberations," they are presumptively privileged. *Id.* (quoting *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997)); *see also Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977) ("The 'presumptive' privilege [for executive communications] embodies a strong presumption, and not merely a lip-service reference.").

With the conclusion that the materials seized from the Movant are all presumptively privileged, it is unreasonable to allow the prosecutorial team to review them without meaningful safeguards. Short of returning the seized items to Movant, only a neutral review by a Special Master can protect the "'great public interest' in preserving 'the confidentiality of conversations that take place in the President's performance of his official duties' because such confidentiality is necessary to protect 'the effectiveness of the executive decision-making process.'" *In re Grand Jury Proc.*, 5 F. Supp. 2d at 25 (citing *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973); *In re Sealed Case*, 121 F.3d at 742).

### A DOJ Filter Team Will Not Protect President Trump's Rights

The Government has advised counsel for President Trump that it is utilizing lawyers within DOJ's NSD as a "filter team." In certain instances, a filter protocol can serve an important role where the Department of Justice seizes documents that are likely to be privileged. As the Justice

Manual notes, a filter team (also called a "privilege team" or "taint team") can be used for the "limited review of arguably privileged material to ascertain whether the material is covered by the warrant" and to protect the disclosure of privileged communications. U.S. Dep't of Just., Justice Manual § 9-13.420, at § E. However, rather than relying on the present filter protocol, this Court should appoint a Special Master for a variety of reasons.

The implementation of this filter protocol was procedurally deficient. The Eleventh Circuit has written, "[e]x *parte* communications generally are disfavored because they conflict with a fundamental precept of our system of justice: a fair hearing 'requires a reasonable opportunity to know the claims of the opposing party and to meet them.'" *In re Colony Square Co.*, 819 F.2d 272, 276 n.12 (11th Cir. 1987) (quoting *In re Paradyne Corp.*, 803 F.2d 604, 612 (11th Cir. 1986)). In *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 178–79 (4th Cir. 2019) ("*Baltimore Law Firm*"), the Fourth Circuit specifically noted the problem of setting filter protocols *ex parte*, in reversing a district court decision denying a restraining order on the review of seized material. Among other issues, the *Baltimore Law Firm* court reversed because the magistrate judge had approved a filter protocol without conducting appropriate adversarial proceedings, which would have allowed the defense to advocate for proper safeguards. *Id.* "In such contested proceedings, the judge could have been fully informed of the relevant background on the [defendant], as well as the nature of the seized materials." *Id.* Without the affidavit, the defense does not know what disclosures were made to the magistrate in support of its filter plan.

Here, too, the magistrate judge approved the filter protocol without input from the defense. The result is a protocol that is plainly ineffective—it simply does not ensure that prosecution team members will not access or become aware of privileged materials particularly as the filter team's leader is a deputy to the lead prosecutor in this matter.

## **Fundamental Fairness Requires That This Court Appoint A Special Master**

Courts considering analogous issues have appointed Special Masters, with one court noting the value of a Special Master in comparison with a filter team. In particular, this Court and others have assessed the use of Special Masters following the execution of search warrants at attorneys' offices—contexts involving similar matters of privilege with far less historic importance. For example, in *United States v. Stewart*, No. 02-cr-395, 2002 WL 1300059 (S.D.N.Y. June 11, 2002), the U.S. District Court for the Southern District of New York weighed an attorney's request for a Special Master after the Government had searched her office pursuant to a warrant. Accordingly, that court considered the narrow question of whether seized material should be reviewed by a filter team or by a Special Master. The court appointed a Special Master, highlighting certain concerns inherent to many filter protocols—including the one presently in place—and the benefits of appointing a Special Master. *Stewart*, 2002 WL 1300059, at *7–8. The court also cited three other courts that had allowed filter teams to review seized materials and later opined "that the use of other methods of review would have been better." *Id.* at *6. For example, in *United States v. Hunter*, 13 F. Supp. 2d 574, 583 & n.2 (D. Vt. 1998), the court noted, with the benefit of hindsight, that: "[i]t may have been preferable for the screening of potentially privileged records to be left not to a [filter team] but to a special master or magistrate judge."

Ultimately, the *Stewart* court appointed a Special Master—with the authority to determine responsiveness, privilege issues, and whether any valid exceptions to the privilege exist—on fairness grounds. *Id.* at *8–10. In appointing a Special Master, the court noted the importance of establishing a procedure that was "not only . . . fair but also appear[ed] to be fair," adding that "[t]he appearance of fairness helps to protect the public's confidence in the administration of justice and the willingness of clients to consult with their attorneys." *Id.* at *8. *See also In the*

*Matter of Search Warrants Executed on April 9, 2018*, No. 18-MJ-3161 (S.D.N.Y.), Dkt. 38 at 8, Dkt. 104 at 88 (similarly appointing a Special Master to review documents seized from attorney's office in light of both fairness and the perception of fairness); *United States v. Abbell*, 914 F. Supp. 519, 519 (S.D. Fla. 1995) (finding that "the responsiveness and privilege issues raised" following the seizure of materials from a law firm "are exceptional and warrant referral to a Special Master.").

As a general matter, given the circumstances here, a taint team is insufficient. "The appearance of Justice must be served, as well as the interests of Justice. It is a great leap of faith to expect that members of the general public would believe that any such Chinese wall would be impenetrable; this notwithstanding the honor of an [Assistant United States Attorney]." *Stewart*, 2002 WL 1300059, at *8 (citing *In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 59 (S.D. N.Y 1994)).

This matter has captured the attention of the American public. Merely "adequate" safeguards are not acceptable when the matter at hand involves not only the constitutional rights of President Trump, but also the preservation of executive privilege. Movant submits that the appointment of a Special Master is the only appropriate action and, for it to have any meaning at all, a protective order should issue ordering the United States to cease review of the seized materials immediately.

**C.**     **The Government Must Provide An Informative Receipt For Property.**

Rule 41(f) of the Federal Rules of Criminal Procedure requires that law enforcement leave a "Receipt for Property" with the person from whom the items were seized, or at the location of the search. Fed. R. Crim. P. 41(f)(1)(C). And, Rule 41(f)(B) states, "Inventory. An officer present during the execution of the warrant must prepare and verify an inventory of any property seized."

The rule does not just dictate creating an inventory but requires that it be "verified," a term that suggests some assessment of the contents of the receipt. The rule further requires that the "officer executing the warrant . . . promptly return it—together with a copy of the inventory—to the magistrate judge designated on the warrant." Fed. R. Crim. P. 41(f)(1)(D). On request, the judge must "give a copy of the inventory to the person from whom, or from whose premises, the property was taken[.]" *Id.*

Attached hereto as Exhibit 1 are the three pages of "Receipt for Property" left by the agents following the search of the former President's home on August 8, 2022. The "Receipt" lists 45 entries describing items as a "Box labeled [number]" or "Binder of Photos," in addition to documents that are variously identified as marked Secret, Top Secret or Confidential. Combined with a sealed Search Warrant Affidavit, this "Receipt" does little to identify the materials that were seized from President Trump's home. This level of detail does not meet the standard of "verification" required in Rule 41(f).

An inventory of property seized is ministerial. *United States v. Robinson*, No. 08-60179-CR, 2008 WL 5381824, at *9–10 (S.D. Fla. Dec. 19, 2008). However, it is a matter of fundamental fairness that the agents at least identify from what locations each box of documents was seized; whether these boxes were at the location or were boxes that the agents brought with them and filled; whether other items were contained in those boxes; whether confidential labels were based upon labels imprinted on the documents themselves, and whether the return label was the result of a review (of presumptively privileged executive communications) to make that determination.

Movant submits the current Receipt for Property is legally deficient. Accordingly, the Government should be required to provide a more detailed and informative Receipt For Property, which states exactly what was seized, and where it was located when seized. In addition, Movant

requests that the Court provide him with a copy of the inventory. This, along with inspection of the full Affidavit, is the only way to ensure the President can properly evaluate and avail himself of the important protections of Rule 41.

## IV.    CONCLUSION

For the foregoing reasons, President Donald J. Trump respectfully requests that this Court issue an order that: (a) appoints a Special Master; (b) enjoins further review of seized materials by the Government until a Special Master is appointed; (c) requires the Government to provide a more detailed Receipt For Property; and (d) requires the Government to return any item seized that was not within the scope of the Search Warrant.

Dated: August 22, 2022                    Respectfully submitted,

 /s/ Lindsey Halligan
Lindsey Halligan
Florida Bar No. 109481
511 SE 5th Avenue
Fort Lauderdale, FL 33301
Email: lindseyhalligan0@gmail.com

 /s/ James M. Trusty
James M. Trusty
Ifrah Law PLLC
1717 Pennsylvania Ave. N.W. Suite 650
Washington, DC  20006
Telephone: (202)524-4176
Email: jtrusty@ifrahlaw.com
(pro hac vice filed contemporaneously)

 /s/ M. Evan Corcoran
M. Evan Corcoran
SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC
400 East Pratt Street – Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Email: ecorcoran@silvermanthompson.com
(pro hac vice filed contemporaneously)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of August 2022, a copy of the foregoing

Motion For Judicial Oversight And Additional Relief was served *via electronic mail* on counsel

for the Government, as set forth below.

/s/ Lindsey Halligan
Lindsey Halligan

Served on:      Juan Antonio Gonzalez
                UNITED STATES ATTORNEY
                Florida Bar No. 897388
                99 NE 4th Street, 8th Floor
                Miami, Fl 33132
                Telephone: (305) 961-9001
                Email: juan.antonio.gonzalez@usdoj.gov

                Jay I. Bratt
                Chief
                Counterintelligence and Export Control Section
                National Security Division
                950 Pennsylvania Avenue, NW
                Washington, D.C. 20530
                Illinois Bar No. 6187361
                (202) 233-0986
                jay.bratt2@usdoj.gov

# **EXHIBIT 1**

FD-597 (Rev. 4-13-2015)                                                                                    Page 1 of 1

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION

# RECEIPT FOR PROPERTY

Case ID:   WF-█████████

On (date)   8/8/2022

Item(s) listed below were:
- ☒ Collected/Seized
- ☐ Received From
- ☐ Returned To
- ☐ Released To

(Name)   Mar-A-Lago

(Street Address)   1100 S OCEAN BLVD

(City)   PALM BEACH, FL 33480

### Description of Item(s):

| 4 – Documents |
| 29 – Box labeled A-14 |
| 30 – Box Labeled A-26 |
| 31 – Box Labeled A-43 |
| 32 – Box Labeled A-13 |
| 33 – Box Labeled A-33 |

Received By: *Christine Bobb* (signature)

Received From: ████████████ (signature)

Printed Name/Title: *Christine Bobb attorney*

Printed Name/Title: ████████████ / SSA

6:19 pm on 8/8/22

FD-597 (Rev. 4-13-2015)                                                                                                   Page 1 of 2

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION

# RECEIPT FOR PROPERTY

Case ID:  WF-███████

On (date)  8/8/2022 _____

item(s) listed below were:
- ☒ **Collected/Seized**
- ☐ **Received From**
- ☐ **Returned To**
- ☐ **Released To**

(Name)  Mar-A-Lago

(Street Address)  1100 S OCEAN BLVD

(City)  PALM BEACH, FL 33480

## Description of Item(s):

1 - Executive Grant of Clemency re: Roger Jason Stone, Jr.

1A - Info re: President of France

2 - Leatherbound box of documents

2A - Various classified/TS/SCI documents

3 - Potential Presidential Record

5 - Binder of photos

6 - Binder of photos

7 - Handwritten note

8 - Box labeled A-1

9 - Box labeled A-12

10 - Box Labeled A-15

10A - Miscellaneous Secret Documents

11 - Box Labeled A-16

11A - Miscellanous Top Secret Documents

12 - Box labeled A-17

13 - Box labeled A-18

13A - Miscellaneous Top Secret Documents

14 - Box labeled A-27

14-A - Miscellaneous Confidential Documents

FD-597 (Rev. 4-13-2015)                                                          Page 2 of 2

# UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION

# RECEIPT FOR PROPERTY

15 - Box Labeled A-28

15A - Miscellaneous Secret Documents

16 - Box labeled A-30

17 - Box labeled A-32

18 - Box labeled A-35

19 - Box labeled A-23

19A - Confidential Document

20 - Box Labeled A-22

21 - Box labeled A-24

22 - Box Labeled A-34

23 - Box Labeled A-39

23A - Miscellaneous Secret Documents

24 - Box labeled A-40

25 - Box Labeled A-41

25A - Miscellaneous Confidential Documents

26 - Box Labeled A-42

26A - Miscellaneous Top Secret Documents

27 - Box Labeled A-71

28 - Box Labeled A-73

28A - Miscellaneous Top Secret Documents

**Received By:** *Christine Bobb* (signature)

**Printed Name/Title:** *Christina Bobb*
*attorney*
*6:19pm on 8/8/22*

**Received From:** ▮▮▮▮▮▮ (signature)

**Printed Name/Title:** ▮▮▮▮▮▮ */Special Agent*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

In the Matter of the Search of

Mar-a-Lago
1100 S. Ocean Blvd.
Palm Beach, FL 33480
_____/

### CERTIFICATION OF M. EVAN CORCORAN

M. Evan Corcoran, Esquire, pursuant to Rule 4(b) of the Rules Governing the Admission,

Practice, Peer Review, and Discipline of Attorneys, hereby certifies that: (1) I have studied the

Local Rules of the United States District Court for the Southern District of Florida;  (2) I am a

member in good standing of the Bar of the District of Columbia, the United States District Court

for the District of Maryland, the United States District Court for the District of Columbia, and the

United States District Court for the Eastern District of Virginia; and (3) I have not filed three or

more motions for pro hac vice admission in this District within the last 365 days.

/s/ M. Evan Corcoran
M. Evan Corcoran
