No. 21-932

---

# In The
# Supreme Court of the United States

---

DONALD J. TRUMP,
*Petitioner,*

*v.*

BENNIE G. THOMPSON, *et al.,*
*Respondents.*

---

On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the District of Columbia Circuit

---

## BRIEF OF *AMICI CURIAE* GOVERNMENT ACCOUNTABILITY PROJECT, GOVERNMENT INFORMATION WATCH, NATIONAL SECURITY COUNSELORS, LOUIS FISHER, HEIDI KITROSSER, MARK J. ROZELL, JONATHAN SHAUB, AND MITCHEL A. SOLLENBERGER IN OPPOSITION TO CERTIORARI

LOUIS CLARK
GOVERNMENT
  ACCOUNTABILITY PROJECT
1612 K St., NW
Suite 1100
Washington, DC 20006
202-441-0333
LouisC@whistleblower.org

KELLY MCCLANAHAN
*Counsel of Record*
NATIONAL SECURITY
  COUNSELORS
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
Kel@NationalSecurityLaw.org

*Counsel for* Amici Curiae

Att. 2

i

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..........................................i

TABLE OF AUTHORITIES....................................iii

INTERESTS OF AMICI..........................................1

SUMMARY OF ARGUMENT................................2

ARGUMENT..............................................................3

      I.     PETITIONER'S CLAIM DOES NOT FIT WITHIN THE *YOUNGSTOWN* SCHEME..............................................3

      II.    PETITIONER'S CLAIM IS INCOMPATIBLE WITH THE PRA ......................................................8

      III.   PETITIONER LACKS THE CONSTITUTIONAL AUTHORITY TO ASSERT ANY CONSTITUTIONAL PRIVILEGE.. 12

           A.    *NIXON V. GSA* WAS DECIDED IN A SIGNIFICANTLY DIFFERENT CONTEXT ...... 13

           B.    *NIXON V. GSA* IS ABOUT PRESERVING PROTECTED STATUS ................................... 17

ii

CONCLUSION...... ................................................... 22

iii

## TABLE OF AUTHORITIES

CASES:                                                           PAGES:

*Cannon v. Univ. of Chicago*, 441 U.S.
    677 (1979) ........................................................9

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249
    (1992)..............................................................9

*Goodyear Atomic Corp. v. Miller*, 486 U.S.
    174 (1988) ........................................................9

*In re Von Bulow*, 828 F.2d 94 (2d Cir. 1987)...14

*Little v. Barreme*, 6 U.S. 170 (1804) ................9

*Marks v. CIA*, 590 F.2d 997 (D.C. Cir. 1978) ..9

*Medellin v. Texas*, 552 U.S. 491 (2008) ............3

*Merrill Lynch v. Dabit*, 547 U.S. 71 (2006) ......9

*\*Nixon v. Adm. of Gen. Servs.*, 433 U.S. 425
    (1977).................................................*passim*

*Nixon v. Freeman*, 670 F.2d 346 (D.C. Cir.
    1982) ..............................................................11

*Pa. v. Union Gas Co.*, 491 U.S. 1 (1989)...........11

*Public Citizen v. Burke*, 843 F.2d 1473
    (D.C. Cir. 1988)............................................6, 17

iv

*Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).............................................................6

*United States v. Nixon*, 418 U.S. 683 (1974)...19

*Upjohn Co. v. United States*, 449 U.S. 383 (1981)...........................................................15

*Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP*, 684 F.3d 1364 (Fed. Cir. 2012)...........................................................14

*\*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)...............................*passim*

**STATUTES AND RULES:**                    **PAGES:**

44 U.S.C. § 2204.................................................10

44 U.S.C. § 2208.............................................8, 10

Exec. Order 13233 ..............................................8

Exec. Order 13489 ..............................................8

Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187.......7

v

MISCELLANEOUS:                                    PAGES:

Ronald J. Ostrow & David Savage, *Senate
    Panel to Receive Rehnquist Documents;
    Administration Ends Impasse on Memos
    Written as Legal Advisor to Nixon; Scalia
    Hearings Open*, L.A. Times, Aug. 6, 1986,
    at A1. ............................................................16

Robert C. Randolph & Daniel C. Smith,
    *Executive Privilege and the Congressional
    Right of Inquiry*, 10 Harv. J. on Legis.
    621 (1973) ......................................................16

1

## INTERESTS OF AMICI[1]

The Government Accountability Project, Government Information Watch, National Security Counselors, Louis Fisher, Heidi Kitrosser, Mark J. Rozell, Jonathan Shaub, and Mitchel A. Sollenberger, (collectively "Amici") respectfully submit this *Amici Curiae* Brief in Opposition to Certiorari. All parties to this litigation consent to the filing of this Brief. Amici are divided into two categories: (1) non-profit organizations organized under Section 501(c)(3) of the Internal Revenue Code which specialize in, *inter alia*, government transparency and accountability issues; and (2) law professors and/or scholars who teach, research, and/or write about topics related to Executive Privilege and/or the Presidential Records Act. They submit this Brief in support of Respondents to explain why there is no legitimate basis for a former President to prevail in a case in which the incumbent President has expressly waived the relevant privileges, and that because there is accordingly no reason to grant a preliminary injunction on the grounds that former President Trump might prevail, there is no need for this Court to review the case on the merits. Their interest in this case is ensuring that a former President cannot use claims of privilege under the Presidential Records Act as a means to override the legitimate interests of the incumbent

---

[1] Pursuant to Supreme Court Rule 37.6, undersigned counsel states that no party's counsel authored this Brief in whole or in part. Nor did any party or party's counsel, or any other person other than *amici curiae* or their counsel, contribute money that was intended to fund preparing or submitting this Brief.

2

President and the American people in government transparency and accountability.

## SUMMARY OF ARGUMENT

There is no legal theory of privilege which would allow former President Trump to prevail in this litigation, and this Court should accordingly affirm the District Court's Order—and the Circuit Court's affirmation thereof—because of Petitioner's failure to show a likelihood of success. Because any preliminary injunction or stay at this point would only be in the service of delay, and because, as the House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee"), the National Archives and Records Administration, and numerous *amici curiae* argued, there is an overwhelming need for the Select Committee to receive this information as soon as possible, the Court should not assist in Petitioner's attempts to delay the inevitable.

Amici fully endorse the ruling of Judge Tanya S. Chutkan in this matter and the Circuit Court's decision to affirm it. Amici urge the Court not to grant certiorari because Petitioner's arguments are not supported and, as the lower courts have found, he has failed to show a likelihood of success. However, Amici also respectfully maintain that the courts below did not go far enough. Should the Court grant certiorari, it should do so only to summarily affirm the below decisions and, ideally, to explicitly affirm that no former President may successfully assert Executive Privilege over information for which the incumbent

3

President has expressly waived it. Both courts below have rightly found that former President Trump's arguments on this point are without merit, so Amici urge the Court to reach the same outcome by either denying certiorari or, alternatively—if the Court decides to review this case—to settle this question more conclusively based on the arguments presented herein.

## ARGUMENT

## I.   PETITIONER'S CLAIM DOES NOT FIT WITHIN THE *YOUNGSTOWN* SCHEME

"The President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'" *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). "Justice Jackson's familiar tripartite scheme provides the accepted framework for evaluating executive action." *Id.* Simply put, this test is as follows:

> 1.   When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, *and in these only*, may he be said (for what it may be worth)

4

> to personify the federal sovereignty. . . .
>
> 2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. . . .
>
> 3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject.

*Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring) (emphasis added). At its core, this case boils down to a dispute over how Justice Jackson would classify a former President's ability to control information after the end of his Administration.

In order for a former President to unequivocally assert a personal ability to invoke any privilege held by the Office of the President over the objections of the incumbent President, he would have to "personify the federal sovereignty." *Id.* at 636. In other words, he would need to act "pursuant to an express or implied

5

authorization of Congress." *Id.* at 635. This is the category Petitioner attempts to lay claim to, arguing that his right to do so is authorized both by the Constitution and by the Presidential Records Act ("PRA"). However, not only does former President Trump's claim not fit within the first category, it does not even fit within the framework. In order to explain this case in terms of *Youngstown*, the Court would need to create a fourth, even weaker category:

> 4. When a former President takes measures incompatible with the expressed or implied will of both Congress and the incumbent President, his power is virtually nonexistent, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter and minus any constitutional powers of the incumbent President over the matter. Courts can sustain exclusive control by a former President in such a case *only by disabling both the Congress and the incumbent President* from acting upon the subject.

To the extent that the Court recognizes some form of presidential communications privilege that can be invoked by a former President over the objection of an incumbent President—which, notwithstanding *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425 (1977) ("*Nixon v. GSA*"), it should

6

not, as explained below—it is this fourth category into which such an assertion would fall.

As a practical concern, however, it is impossible to imagine a scenario where such authority could be held to exist, where a court would nonetheless choose to itself "intrude[] into the executive function and the needs of the Executive Branch," *id.* at 449, simply because it believed that the duly elected head of the Executive Branch was not properly safeguarding his own branch's institutional interests. In order to do so, it would have to ignore: (1) the fact that "[i]t is true that only the incumbent is charged with performance of the executive duty under the Constitution," *id.* at 448; (2) the observation that "the fact that [the incumbent does not] support[] [the former President]'s claim detracts from the weight of his contention," *id.* at 449; and (3) the fact that "the incumbent President is not constitutionally obliged to honor [a] former President['s] invocation of executive privilege," *Public Citizen v. Burke*, 843 F.2d 1473, 1479 (D.C. Cir. 1988), This framing may sound like hyperbole, but that is exactly what Petitioner is asking this Court to do, and the Court should forcefully decline. The Circuit Court's opinion rightfully noted that because Petitioner is no longer the President, the separation of powers concerns outlined in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2035 (2020), and *Youngstown* "necessarily have less traction" and "less salience" especially because the executive and legislative branches here are in agreement. Pet. App. 59a. This Court should therefore either deny certiorari or summarily affirm the Circuit Court's decision, clarifying this framework with the arguments presented here by Amici.

7

The remainder of this Brief will explain why Petitioner's claim regarding the presidential communications privilege is both contrary to the express will of Congress—through its passage of the Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187—and unsupported by the Constitution, rendering it a nullity and leaving Petitioner no chance—let alone a likely chance—of success on the merits.

As an initial note, however, it is important for Amici to clarify the scope of their argument. They do not address whether the Select Committee has demonstrated an overriding interest, or even whether the Select Committee's requests are viable. These are questions better addressed by Respondents and perhaps other *amici curiae*, to the extent that they need to be answered at all. While Amici agree that the Select Committee's requests are viable and that the Select Committee has demonstrated an overriding interest sufficient to overcome an invocation of the presidential communications privilege, they maintain that the Court does not need to even *address* the question of balancing the interests, because Petitioner simply lacks the authority to claim *any* privilege that President Biden has waived. Put another way, "The Select Committee maintains, for preservation purposes, that the Constitution and the PRA foreclose a former President from asserting executive privilege over the disagreement of the incumbent President, and foreclose a claim of executive privilege," Resps. Thompson & Select Comm. C.A. Br. at 41 n.51; that argument is the almost total focus of this Brief, even though the Circuit Court declined to reach it. *See* Pet. App. 40a ("[W]e need not conclusively resolve whether

8

and to what extent a court could second guess the sitting President's judgment that it is not in the interests of the United States to invoke privilege.").

## II.    PETITIONER'S CLAIM IS INCOMPATIBLE WITH THE PRA

When the PRA was initially passed in 1978, it remained silent on the question of the interplay between a former President and an incumbent President in the context of a request for former Presidential records. *Nixon v. GSA* had just been decided the previous year, and the parameters of a hypothetical meritorious claim of a former President were unknown. Accordingly, Presidents were left to their own devices to answer this question, and they did so in a series of Executive Orders which ranged from "the Archivist shall not permit access to the records by a requester unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records," Exec. Order 13233 § 3(d)(1)(ii), to "the Archivist shall abide by any instructions given him by the incumbent President or his designee," Exec. Order 13489 § 4(b). Had this case arisen in 2004, former President Trump's claim would have been classified into Justice Jackson's zone of twilight, if not the first category, because there were insufficient clues to allow a court to ascertain the will of Congress. However, in 2014, Congress amended the PRA to permanently and unequivocally give the incumbent President the final say. *See* 44 U.S.C. § 2208(c)(2)(C)  ("If    the    incumbent    President

9

determines not to uphold the claim of privilege asserted by the former President, . . . the Archivist shall release the Presidential record subject to the claim at the end of the 90-day period beginning on the date on which the Archivist received notification of the claim."). Simply put, Congress passed a statute which superseded the relevant Executive Orders: a phenomenon that courts have uniformly recognized since the Court's holding in *Little v. Barreme* in 1804. 6 U.S. 170, 179 (1804); *accord Marks v. CIA*, 590 F.2d 997, 1003 (D.C. Cir. 1978) ("Of course, an executive order cannot supersede a statute."). And, of course, the "cardinal canon" of statutory interpretation is that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992), so there can be no question that this statute was an unambiguous reflection of the will of Congress.

Moreover, the Court must presume that when Congress amended the PRA, it did so with knowledge of the current prevailing legal interpretations. *Merrill Lynch v. Dabit*, 547 U.S. 71, 85–86 (2006); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 698–99 (1979). Accordingly, when a new statute changes a standard or a process, the Court must presume that Congress intended to do so. In this case, Congress clearly meant to supersede all the relevant portions of prior Executive Orders, including Executive Order 13489, and so any questions about whether or not that or any other Order would support Petitioner's claims become academic, notwithstanding the fact that the parties all appear to take it for granted that Executive

10

Order 13489 still remains in force in its entirety. Whatever Congressional silence allowed the President to establish the terms of this relationship and bring disputes like this one into the zone of twilight was irretrievably broken when President Obama signed Pub. L. 113-187, and the Court need not spend any significant time or energy considering that question.

Before completing this discussion of the PRA, it is important to briefly address another provision which could conceivably be considered to implicitly support Petitioner's claim, but which does not actually do so. The PRA makes mention twice of the potential for a former President to file a lawsuit to prevent the disclosure of information, as former President Trump did in this case. First the law states that the U.S. District Court for the District of Columbia "shall have jurisdiction over any action initiated by the former President asserting that a determination made by the Archivist violates the former President's rights or privileges," 44 U.S.C. § 2204(e), and it then explicitly incorporates this possibility into the timeline the process may take, *see id.* § 2208(c)(2)(C) (directing the Archivist to release information "unless otherwise directed by a court order in an action initiated by the former President under section 2204(e) of this title or by a court order in another action in any Federal court"). However, a statutory provision merely providing for the possibility of a lawsuit cannot be read to imply that any such lawsuit would be meritorious, and the Court should not read into these provisions an implicit recognition that such a valid claim would exist.

11

As noted above, the PRA was written one year after *Nixon v. GSA* was decided by this Court. In that case, the Court allowed for the possibility that a former President "*may* legitimately assert the Presidential privilege," 433 U.S. at 449 (emphasis added), but gave no indication of what such a legitimate assertion would look like. It is no surprise, then, that Congress incorporated this hypothetical possibility into the PRA a year later, but there is no support in either the statute itself or the legislative history that any Member of Congress held any belief that such a case would be meritorious. Justice Scalia rather colorfully characterized this phenomenon as "[M]embers of Congress . . . need have nothing in mind in order for their votes to be both lawful and effective." *Pa. v. Union Gas Co.*, 491 U.S. 1, 30 (1989) (Scalia, J., partially dissenting). When Congress amended the PRA in 2014, it simply incorporated a reference to the existing provision into the new framework, and there is no reason to believe that any Member of Congress harbored any belief that such a claim would be meritorious that time either. At most, Congress can be understood to simply believe that "those who see in disclosure a threat to the privilege must be given a meaningful opportunity to contest disclosure on that basis," *Nixon v. Freeman*, 670 F.2d 346, 359 (D.C. Cir. 1982). The Court should accordingly read these provisions as what they are on their face: an allowance that the Supreme Court stated in 1977 that a former President might sue, not that he would ever *win.*

12

### III.  PETITIONER LACKS THE CONSTITUTIONAL AUTHORITY TO ASSERT ANY CONSTITUTIONAL PRIVILEGE

Petitioner's entire case hangs on the Court's interpretation of *Nixon v. GSA*. That case, however, does not actually support Petitioner's position, for two reasons. First, as noted above, it is a product of its time, and to the extent that it stated that a former President still retained a residual privilege, it should be read to hold that a former President still retained a residual privilege *in 1977* before Congress unequivocally made its will known in 2014. Second, it is not accurate to read *Nixon v. GSA* to mean that, even in 1977, a former President held a residual privilege personally that he could assert over the incumbent President's objection in a specific dispute over specific records. A better reading would be an interpretation in which the Court is understood to merely have held that the presidential communications privilege *still protects* information created by previous administrations—as opposed to, for instance, an incumbent President being unable to assert the privilege to protect records created by his predecessor—and that a former President simply had *standing* to assert them if the incumbent President remained silent. Therefore, the Court should either decline to review this case because of the correct decision reached by the lower courts, or, if the Court decides to grant certiorari, it should hold that *Nixon v. GSA* is only loosely applicable to the instant case, and that, to the extent it is applicable, it supports Respondents. A further discussion of that case follows.

13

### A.   *NIXON V. GSA* WAS DECIDED IN A SIGNIFICANTLY DIFFERENT CONTEXT

It is important to note that *Nixon v. GSA* was a facial challenge to the PRA's predecessor statute, specifically the provision directing the GSA Administrator to promulgate regulations governing the handling of former President Nixon's papers; the Court made clear that its review was limited to the facial validity of the statute in question. *Nixon v. GSA*, 433 U.S. at 455. Furthermore, much of the Court's analysis hinged on the fact that the records were *not* being provided to anyone outside the Executive Branch. *Id.* at 441. Both of these facts counsel against a strict application of *Nixon v. GSA* to the instant case. It did not involve a scenario in which a former President's papers were being given to Congress or disclosed publicly, and it most importantly did not involve the incumbent President's express agreement to such a disclosure.

In *Nixon v. GSA*, the Court made special note of the fact that "[t]he Executive Branch became a party to the Act's regulation when President Ford signed the Act into law, and the administration of President Carter, acting through the Solicitor General, vigorously supports affirmance of the District Court's judgment sustaining its constitutionality." *Id.* However, legally speaking, supporting a statute's constitutionality is not the same as expressly waiving a privilege, and neither former President Ford's signing of the statute nor then-incumbent President Carter's support of the

14

statute are comparable to President Biden's express direction to the Archivist to release the relevant records. Supporting a statute generally is a policy decision, while expressly waiving a privilege is a *legally binding* decision.

"[T]he privilege of confidentiality of Presidential communications derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Id.* at 447. It is, however, just a privilege, and it follows the same rules of any other privilege; most importantly, *once it is expressly waived, it no longer applies*. Simply put, once a privilege is expressly waived by the party with the authority to do so, the information in question cannot be withheld. For instance, it is well-established that if a client authorizes an attorney to release information which would otherwise be protected by the attorney-client privilege, the attorney may not cite the attorney-client privilege to withhold the information. *See generally Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP*, 684 F.3d 1364, 1370 (Fed. Cir. 2012) (voluntary consent constitutes express waiver of attorney-client privilege); *In re Von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987) ("Of course, the privilege belongs solely to the client and may only be waived by him. An attorney may not waive the privilege without his client's consent.").

The question then becomes, who is the party with the authority to waive the presidential communications privilege? Generally, a privilege is held by the party to whom its benefit accrues. A client benefits from the attorney-client privilege because it allows the client to candidly seek and obtain legal

15

advice. A patient benefits from the psychotherapist-patient privilege for much the same reason. With this in mind, it is clear that *Nixon v. GSA* already answered this question: "the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic." 433 U.S. at 449. In other words, it is a *Governmental* privilege, not a personal privilege.

It naturally follows, then, that because the presidential communications privilege is a Governmental privilege, it can only be expressly waived by a representative of the Government. Therefore, even if it may be *asserted* by a former President, it can be *waived* by the incumbent President, and that waiver means that the information in question cannot be withheld from disclosure by any other interested party. Just as a former Chief Executive Officer lacks the legal authority to prohibit a corporation's in-house counsel from releasing information if the current CEO expressly waives the attorney-client privilege on behalf of the corporation, *accord Upjohn Co. v. United States*, 449 U.S. 383, 389–90 (1981), a former President lacks the legal authority to prohibit an Executive Branch official from releasing information if the incumbent President expressly waives the presidential communications privilege on behalf of the Executive Branch.

Amici turn to briefly address what appears to be former President Trump's main complaint: "President Biden is attempting to waive the executive privilege of his predecessor, without any legal basis for doing so. Indeed, the Biden administration does

16

not even attempt to argue that President Trump improperly designated the records at issue as being protected by executive privilege." Pet. C.A. Br. at 34. In making this complaint, Petitioner effectively asks this Court to hold that an express waiver of a privilege is only valid or legally binding if it is done for the right reason, or, *e.g.*, if the holder of the privilege "argue[s] that [the predecessor] improperly designated the records" in some way. This is, simply put, not how a privilege waiver works.

The holder of a privilege may expressly waive the protection of that privilege for literally *any reason whatsoever*. In the context of the deliberative process privilege, there is even a term for such a waiver: *discretionary release*. As in, the Government's choice to release otherwise privileged information is *discretionary*. Furthermore, with respect to the presidential communications privilege in particular, Presidents have waived its protection for political reasons numerous times. For instance, President Nixon withdrew a privilege claim to prevent White House staff from testifying before Congress, so that the Senate Judiciary Committee would confirm Richard Kleindienst as Attorney General. Robert C. Randolph & Daniel C. Smith, *Executive Privilege and the Congressional Right of Inquiry*, 10 Harv. J. on Legis. 621, 649 (1973). President Reagan similarly dropped a privilege claim over documents related to William Rehnquist's tenure in the Department of Justice so that the Senate Judiciary Committee would confirm him as Chief Justice of the Supreme Court. Ronald J. Ostrow & David Savage, *Senate Panel to Receive Rehnquist Documents; Administration Ends Impasse on Memos Written as Legal Advisor to Nixon;*

17

*Scalia Hearings Open*, L.A. Times, Aug. 6, 1986, at A1. In these cases and others, the President simply decided it was not worth the political cost to continue such battles with Congress, and they undeniably had the right to make that determination. Simply put, even though Respondents deny that President Biden's decision was "the result of politically motivated capitulation by the Executive Branch," Resps. Thompson and Select Comm. Br. at 18, it would make no legal difference if it *were*; such is the nature of a privilege waiver.

This question of waiver was not before the *Nixon v. GSA* Court, and so its opinion should not be read to counsel otherwise. Moreover, such a reading would place *Nixon v. GSA* directly at odds with the Circuit Court's longstanding precedent, since the Circuit Court has held that "the incumbent President is not constitutionally obliged to honor [a] former President['s] invocation of executive privilege with respect to [the former President's] papers." *Public Citizen*, 843 F.2d at 1479. In such a case, where the lower courts' decisions resulted from a straightforward—if unnuanced—application of this Court's precedents, certiorari is especially disfavored.

**B.   *NIXON V. GSA* IS ABOUT PRESERVING PROTECTED STATUS**

The *Nixon v. GSA* Court specifically endorsed the position of the U.S. Solicitor General:

Unless he can give his advisers some assurance of confidentiality, a President

18

> could not expect to receive the full and frank
> submissions of facts and opinions upon
> which effective discharge of his duties
> depends. The confidentiality necessary to
> this exchange cannot be measured by the
> few months or years between the
> submission of the information and the end
> of the President's tenure; the privilege is not
> for the benefit of the President as an
> individual, but for the benefit of the
> Republic. Therefore the privilege survives
> the individual President's tenure.

*Nixon v. GSA*, 433 U.S. at 448–49. However, it does not necessarily follow that an individual President's ability to unilaterally assert the privilege "survives the individual President's tenure." In context, this opinion is more harmoniously read to say that the *information* protected by the presidential communications privilege continues to be protected beyond the individual President's tenure, because, as Petitioner argues, "[i]f the privilege that covered one administration were to evaporate immediately upon the transition to the next, the privilege would be rendered all but worthless." Pet. Br. 23. While the "chilling effect" is a controversial topic in transparency circles, one cannot deny that current jurisprudence fully embraces it, and until that changes, this Court can reasonably treat it as a valid concern. As such, the Court's endorsement of the Solicitor General's position on this count was unremarkable; it simply held that such information could still be protected. This statement, however,

19

carries with it an implicit caveat: the information can still be protected by someone with the authority to do so. In other words, it can be protected—or waived—by the lawful head of the Executive Branch, and nobody else.

On this note, it is important to return to the relief that Petitioner is ultimately asking this Court to grant: he is asking this Court to substitute its own judgment for that of the head of a co-equal branch regarding whether or not that branch is appropriately protecting its interests. This is constitutionally disfavored, if not outright prohibited. "[E]ach branch of the Government has the duty initially to interpret the Constitution for itself, and . . . its interpretation of its powers is due great respect from the other branches." *Nixon v. GSA*, 433 U.S. at 442–43 (citing *United States v. Nixon*, 418 U.S. 683, 703 (1974)). Regarding the *current* Executive Branch's "interpretation of its powers," this Court is required to afford it "great respect." This respect extends to the determination of whether or not the public interest is served by potentially chilling Government advisors, and it extends to the determination of whether or not it is bound by the PRA. In order to find that former President Trump has *any* authority to *successfully* enforce a presidential communications privilege claim, the Court will have to, as noted above, disable *both the Congress and the incumbent President* from acting upon the subject. This it should not do. *See* Pet. App. at 23a, 50a–51a, 59a–60a (discussing how courts have historically stayed out of these interbranch political negotiations); *id.* at 40a ("A court would be hard-pressed under these circumstances to tell the President that he has miscalculated the interests of

20

the United States, and to start an interbranch conflict that the President and Congress have averted.").

The Circuit Court declined to further resolve this question, however, finding instead that the "profound interests in disclosure" given by President Biden and the January 6th Committee "far exceed [Trump's] generalized concerns for Executive Branch confidentiality." *Id.* at 40a. That finding is the correct outcome in this case, but Amici believe the same reasoning supports this Court either not granting certiorari at all, or if it does, establishing that a former President is simply not in any position to *ever* be able to second-guess the incumbent President in this way. As Judge Chutkan stated in her district court opinion, the incumbent President, not a former President, is best positioned to make these judgment calls regarding the long-term interests of the Executive Branch and the balance of interests between disclosure, on one hand, and the ability of Executive Branch officials to provide full and frank advice, on the other. Pet. App. 93a. And despite Petitioner's assertion that a former President's power "exists in perpetuity," Judge Chutkan agreed that "Presidents are not kings, and Plaintiff is not President," and that he is "no longer situated to protect executive branch interests" in the way President Biden is. *Id.* at 99a. Importantly, he also "no longer remains subject to political checks against potential abuse of that power." *Id.* at 100a. The Circuit Court's opinion acknowledged this aspect of *Nixon*, 443 U.S. at 448, and emphasized the Constitution's clarity regarding *one* person holding this executive power at a time. Pet. App. 41a. As such, there is simply no basis for allowing a former President to assert this kind of Governmental

21

privilege at all. *See id.* at 53a–55a (discussing the interests and political checks involved which better situate the incumbent to make these decisions and, where necessary, be held accountable).

A final point worth reiterating here is that former President Trump appears to be under the belief that executive privilege exists in part for the purpose of preventing a future President from releasing information for "political" purposes. As discussed above, an incumbent President can waive this privilege for virtually any reason, regardless of whether that reason is arguably "political" or not. Yet he argues that the disagreement in this case:

> highlights the importance of executive privilege and the ability of Presidents and their advisers to reliably make and receive full and frank advice, without concern that communications will be publicly released to meet a political objective.

Pet. Emerg. Appl. Stay at 9. This argument fundamentally misunderstands the purpose of the privilege in this situation where the incumbent President has waived the privilege—the privilege is designed to protect against *cross-branch* overreach or interference, not against a President's own successor in the Executive Branch deciding to release information, whatever the reason is. The purpose of the privilege has never been to insulate a former President from discretionary decisions of a successor President, the new leader of the same branch.

22

By the same token, any traditional norms whereby an incumbent might defer to a former President regarding control of the former President's records is based on just that—a norm deriving from, *e.g.*, respect for the office, as a professional courtesy, or, as this Court has recognized, because doing so maintains the balance between the incumbent President and future Presidents. *See Nixon v. GSA*, 433 U.S. at 448. But it is *not* because the former President gets any binding say in what happens once he leaves office. When Congress seeks documents and the sitting President decides that the interests of national security and accountability warrant sharing Executive Branch documents, that is the end of the story. Every assertion by Petitioner overlooking this cross-branch agreement is ignoring how the agreement neutralizes any protective function of the privilege.

## CONCLUSION

"With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law." *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring). If a requirement for a free government is that the Executive be under the law, a *former* Executive can ask no more, yet that is what former President Trump requests. Allowing a former President to override a current President on *any* question is undemocratic and threatens to create a "shadow President," a concept fundamentally foreign to the U.S. Constitution. For the reasons provided above, former President Trump has no legal basis to

23

prevail in this suit, and the Court should accordingly deny certiorari or summarily affirm the Circuit Court's decision.

| | |
|---|---|
| Louis Clark | Kelly McClanahan |
| Government | *Counsel of Record* |
|   Accountability Project | National Security |
| 1612 K St., NW |   Counselors |
| Suite 1100 | 4702 Levada Terrace |
| Washington, DC 20006 | Rockville, MD  20853 |
| 202-441-0333 | 301-728-5908 |
| LouisC@whistleblower.org | Kel@NationalSecurityLaw.org |

*Counsel for* Amici Curiae

January 5, 2022