**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 22-CV-81294-CANNON**

**DONALD J. TRUMP**,

      Plaintiff,

v.

**UNITED STATES OF AMERICA**,

      Defendant.

_____/

## UNITED STATES' RESPONSE TO MOTION FOR JUDICIAL OVERSIGHT AND ADDITIONAL RELIEF

On August 22, 2022, fourteen days after the Department of Justice executed a search warrant at the premises located at 1100 S. Ocean Blvd., Palm Beach, Florida 33480 (hereinafter, the "Premises"), a property of former President Donald J. Trump ("Plaintiff" or "the former President"), Plaintiff filed a "Motion for Judicial Oversight and Additional Relief." Docket Entry ("D.E.") 1. In his motion, Plaintiff requested, among other things, that the Court appoint a special master and that the government return to Plaintiff certain property. *See id.* The following day, this Court ordered Plaintiff to file a supplement to his motion addressing certain questions. D.E. 10. On August 26, Plaintiff filed such a supplement, D.E. 28, and on August 27, the Court entered a preliminary order on Plaintiff's motion, D.E. 29. In compliance with this Order, the government hereby files its public Response to Plaintiff's Motion and Supplement, including Plaintiff's request for the appointment of a special master. *See id*.

The legal issues presented, and the relief requested in the filings, are narrow,

notwithstanding the wide-ranging meritless accusations leveled against the government in the motion. *See* D.E. 1; D.E. 28. Plaintiff's filings present three issues: whether Plaintiff is currently entitled to the return of any property, to injunctive relief, and to the appointment of a special master.[1] Not only does Plaintiff lack standing to raise these claims at this juncture, but even if his claims were properly raised, Plaintiff would not be entitled to the relief he seeks.

## Summary of Argument

Plaintiff's motion to appoint a special master, enjoin further review of seized materials, and require the return of seized items fails for multiple, independent reasons. As an initial matter, the former President lacks standing to seek judicial relief or oversight as to Presidential records because those records do not belong to him. The Presidential Records Act makes clear that "[t]he United States" has "complete ownership, possession, and control" of them. 44 U.S.C. § 2202. Furthermore, this Court lacks jurisdiction to adjudicate Plaintiff's Fourth Amendment challenges to the validity of the search warrant and his arguments for returning or suppressing the materials seized. For those reasons and others, Plaintiff has shown no basis for the Court to grant injunctive relief. Plaintiff is not likely to succeed on the merits; he will suffer no injury absent an injunction—let alone an irreparable injury; and the harms to the government and the public would far outweigh any benefit to Plaintiff.

---

[1] Plaintiff also sought a more detailed receipt for the property seized during the August 8, 2022 execution of the search warrant. D.E. 1 at 19-21; *see generally* D.E. 28. The Court ordered the government to file under seal "[a] more detailed Receipt for Property specifying all property seized pursuant to the search warrant." D.E. 29 at 2. The government filed today under seal, in accordance with the Court's order, the more detailed receipt. Although the receipt of property already provided to Plaintiff at the time of the search, *see In Re Sealed Search Warrant*, No. 22-MJ-8332 (S.D. Fla.) (hereinafter, "MJ Docket"), D.E. 17 at 5-7, is sufficient under Fed. R. Crim. P. 41, the government is prepared, given the extraordinary circumstances, to unseal the more detailed receipt and provide it immediately to Plaintiff.

Even if the Court had jurisdiction to entertain Plaintiff's claims, appointment of a special master is unnecessary and would significantly harm important governmental interests, including national security interests. Appointment of a special master is disfavored in a case such as this. In any event, the government's filter team has already completed its work of segregating any seized materials that are potentially subject to attorney-client privilege, and the government's investigative team has already reviewed all of the remaining materials, including any that are potentially subject to claims of executive privilege. Appointment of a special master to review materials potentially subject to claims of executive privilege would be particularly inappropriate because binding Supreme Court precedent forecloses Plaintiff's argument that review of these materials by personnel *within the Executive Branch* raises any such privilege concerns. Furthermore, appointment of a special master would impede the government's ongoing criminal investigation and—if the special master were tasked with reviewing classified documents—would impede the Intelligence Community from conducting its ongoing review of the national security risk that improper storage of these highly sensitive materials may have caused and from identifying measures to rectify or mitigate any damage that improper storage caused. Lastly, this case does not involve any of the types of circumstances that have warranted appointment of a special master to review materials potentially subject to attorney-client privilege.

## Factual Background

Mindful that the Court ruling on the present motion is not the same Court that authorized the search warrant from which this civil action results, the government provides below a detailed recitation of the relevant facts, many of which are provided to correct the incomplete and inaccurate narrative set forth in Plaintiff's filings.

**A. NARA, upon Observing that It Was Missing Presidential Records from the Former President's Administration, Attempted to Obtain the Missing Records Voluntarily from the Former President's Representatives**

Throughout 2021, the United States National Archives and Records Administration ("NARA") had ongoing communications with representatives of former President Trump in which it sought the transfer of what it perceived were missing records from his Administration. *See* Letter from David S. Ferriero, Archivist of the United States, to the Hon. Carolyn B. Maloney (Feb. 18, 2022), *available at* https://www.archives.gov/files/foia/ferriero-response-to-02.09.2022-maloney-letter.02.18.2022.pdf (hereinafter, "Ferriero Letter") (attached hereto as Attachment A), at 1; Letter from Debra Steidel Wall, Acting Archivist of the United States, to Evan Corcoran (May 10, 2022), *available at* https://www.archives.gov/files/foia/wall-letter-to-evan-corcoran-re-trump-boxes-05.10.2022.pdf (hereinafter, "Wall Letter") (attached hereto as Attachment B), at 1 ("As you are no doubt aware, NARA had ongoing communications with the former President's representatives throughout 2021 about what appeared to be missing Presidential records."). These communications ultimately resulted in the provision of fifteen boxes (hereinafter, the "Fifteen Boxes") from former President Trump to NARA in January 2022. *See* Ferriero Letter at 1; Wall Letter at 1; *see also In Re Sealed Search Warrant*, Case No. 22-MJ-8332 (S.D. Fla.) (hereinafter, "MJ Docket") D.E. 102-1 at ¶¶ 39, 47. When producing the Fifteen Boxes, the former President never asserted executive privilege over any of the documents nor claimed that any of the documents in the boxes containing classification markings had been declassified. NARA asked representatives of the former President, as required by the Presidential Records Act, to continue to search for any additional Presidential records that had not been transferred to NARA. Ferriero Letter at 2.

**B. Observing that the Fifteen Boxes Contained "Highly Classified Records," NARA Sent a Referral to the Department of Justice**

"In its initial review of materials within those boxes, NARA identified items marked as classified national security information, up to the level of Top Secret and including Sensitive Compartmented Information and Special Access Program materials. NARA informed the Department of Justice about that discovery." Wall Letter at 1. Specifically, on February 9, 2022, the Special Agent in Charge of NARA's Office of the Inspector General sent a referral via email to the Department of Justice ("DOJ") (hereinafter, the "NARA Referral"). MJ Docket D.E. 102-1 at ¶ 24. The NARA Referral stated that a preliminary review of the Fifteen Boxes indicated that they contained "newspapers, magazines, printed news articles, photos, miscellaneous print-outs, notes, presidential correspondence, personal and post-presidential records, and a lot of classified records. Of most significant concern was that highly classified records were unfoldered, intermixed with other records, and otherwise unproperly *[sic]* identified." *Id.* (internal quotations omitted). The NARA Referral was made on two bases: evidence that classified records had been stored at the Premises until mid-January 2022, and evidence that certain pages of Presidential records had been torn up. Related to the second concern, the NARA Referral included a citation to 18 U.S.C. § 2071.

**C. The Former President Delayed the FBI's Access to the Fifteen Boxes**

As the NARA Referral stated, the Fifteen Boxes contained "highly classified records." Upon learning this, DOJ sought access to the Fifteen Boxes in part "so that the FBI and others in the Intelligence Community could examine them." Wall Letter at 1. DOJ followed the steps outlined in the Presidential Records Act to obtain access to the Fifteen Boxes. On April 12, 2022, NARA advised counsel for the former President that it intended to provide the FBI with the records the following week (*i.e.*, the week of April 18). *Id.* at 2. That access was not

provided then, however, because a representative of the former President requested an extension of the production date to April 29. *See id.*

As the Acting Archivist recounted, on April 29, DOJ advised counsel for the former President as follows:

> There are important national security interests in the FBI and others in the Intelligence Community getting access to these materials. According to NARA, among the materials in the boxes are over 100 documents with classification markings, comprising more than 700 pages. Some include the highest levels of classification, including Special Access Program (SAP) materials. Access to the materials is not only necessary for purposes of our ongoing criminal investigation, but the Executive Branch must also conduct an assessment of the potential damage resulting from the apparent manner in which these materials were stored and transported and take any necessary remedial steps. Accordingly, we are seeking immediate access to these materials so as to facilitate the necessary assessments that need to be conducted within the Executive Branch.

*See id.*

On the same date that DOJ sent this correspondence, counsel for the former President requested an additional extension before the materials were provided to the FBI and stated that in the event that another extension was not granted, the letter should be construed as "'a protective assertion of executive privilege made by counsel for the former President.'" *Id.* In its May 10 response, NARA rejected both of counsel's requests. First, NARA noted that significant time—four weeks—had elapsed since NARA first informed counsel of its intent to provide the documents to the FBI. *Id.* Second, NARA stated that the former President could not assert executive privilege to prevent others within the Executive Branch from reviewing the documents, calling that decision "not a close one." *Id.* at 3. NARA rejected on the same basis counsel's "'protective assertion'" of privilege. *Id.* at 3-4. Accordingly, NARA informed counsel that it would provide the FBI access to the records beginning as early as Thursday, May 12, 2022. *Id.* at 4. Although the former President could have taken legal action prior to

May 12 to attempt to block the FBI's access to the documents in the Fifteen Boxes, he did not do so.

### D. The FBI's Review of the Fifteen Boxes Highlighted the National Security Implications of Their Improper Storage

Between May 16-18, 2022, after finally obtaining access to the Fifteen Boxes, FBI agents conducted a preliminary review of the documents and identified documents with classification markings in fourteen of the Fifteen Boxes. MJ Docket D.E. 102-1 at ¶ 47. A preliminary review revealed the following: 184 unique documents bearing classification markings, including 67 documents marked as CONFIDENTIAL, 92 documents marked as SECRET, and 25 documents marked as TOP SECRET. *Id.* Further, the FBI agents observed markings reflecting that the documents were subject to sensitive compartments and dissemination controls used to restrict access to material in the interest of national security. *Id.*

### E. After Obtaining Evidence Indicating that Additional Classified Records Remained at the Premises, DOJ Initially Sought Their Return Through the Issuance of a Grand Jury Subpoena[2]

Through its investigation,[3] the FBI developed evidence indicating that even after the Fifteen Boxes were provided to NARA, dozens of additional boxes remained at the Premises that were also likely to contain classified information. Accordingly, DOJ obtained a grand

---

[2] The former President disclosed this subpoena and a subpoena for video footage at the Premises in his filings to this Court. *See, e.g.*, D.E. 1 at 5-6. Thereafter, on August 29, 2022, Chief Judge Howell in the District of Columbia authorized the government to disclose to this Court these grand jury subpoenas and material discussed herein.

[3] Here and in other parts of this public filing, the government refers to evidence developed in its investigation in order to inform the Court of the relevant facts. Of necessity, however, the government cannot publicly describe the sources of its evidence, particularly while the investigation remains ongoing. As Judge Reinhart concluded, revealing this type of information could "impede the ongoing investigation through obstruction of justice and witness intimidation or retaliation." MJ Docket D.E. 80 at 9.

jury subpoena, for which the former President's counsel accepted service on May 11, 2022. *See* Attachment C; *see also* D.E. 1 at 5. The subpoena was directed to the custodian of records for the Office of Donald J. Trump, and it requested "[a]ny and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings [list of classification markings]." Attachment C. DOJ also sent the former President's counsel a letter that suggested they could comply by "providing any responsive documents to the FBI at the place of their location" and by providing from the custodian a "sworn certification that the documents represent all responsive records." *See* Attachment D. The letter further stated that if no responsive documents existed, the custodian should provide a sworn certification to that effect. *Id.*

The subpoena's return date was May 24, 2022. Counsel sought an extension for complying. After initially denying the request, the government offered counsel an extension for complying with the subpoena until June 7, 2022. Counsel for the former President contacted DOJ on the evening of June 2, 2022, and requested that FBI agents meet him the following day to pick up responsive documents.

## F. In Response to the Subpoena, Counsel for the Former President Provided a Limited Number of Documents Accompanied by a Certification that All Responsive Documents Were Produced Following a Diligent Search

On June 3, 2022, three FBI agents and a DOJ attorney arrived at the Premises to accept receipt of the materials. In addition to counsel for the former President, another individual was also present as the custodian of records for the former President's post-presidential office. When producing the documents, neither counsel nor the custodian asserted that the former President had declassified the documents or asserted any claim of executive privilege. Instead, counsel handled them in a manner that suggested counsel believed that the documents were

classified: the production included a single Redweld envelope, double-wrapped in tape, containing the documents. The individual present as the custodian of records produced and provided a signed certification letter, which stated in part the following:

> Based upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump, the following: a. A diligent search was conducted of the boxes that were moved from the White House to Florida; b. This search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena; c. Any and all responsive documents accompany this certification; and d. No copy, written notation, or reproduction of any kind was retained as to any responsive document.

> I swear or affirm that the above statements are true and correct to the best of my knowledge.

*See* Attachment E.[4]

After producing the Redweld, counsel for the former President represented that all the records that had come from the White House were stored in one location—a storage room at the Premises (hereinafter, the "Storage Room"), and the boxes of records in the Storage Room were "the remaining repository" of records from the White House. Counsel further represented that there were no other records stored in any private office space or other location at the Premises and that all available boxes were searched. As the former President's filing indicates, the FBI agents and DOJ attorney were permitted to visit the storage room. *See* D.E. 1 at 5-6. Critically, however, the former President's counsel explicitly prohibited government personnel from opening or looking inside any of the boxes that remained in the storage room, giving no opportunity for the government to confirm that no documents with classification markings remained.

---

[4] According to Plaintiff's filing, the former President had determined that the search for the materials should be conducted. D.E. 1 at 5.

Once in a secure government setting, the FBI conducted a preliminary review of the documents contained in the Redweld envelope. That preliminary document review revealed the following: 38 unique documents bearing classification markings, including 5 documents marked as CONFIDENTIAL, 16 documents marked as SECRET, and 17 documents marked as TOP SECRET. Further, the FBI agents observed markings reflecting sensitive compartments and dissemination controls. Counsel for the former President offered no explanation as to why boxes of government records, including 38 documents with classification markings, remained at the Premises nearly five months after the production of the Fifteen Boxes and nearly one-and-a-half years after the end of the Administration.

### G. After Further Investigation Indicated that the Response to the Subpoena Was Incomplete, that Obstructive Conduct Occurred in Connection with the Response to the Subpoena, and that Classified Information Remained at the Premises, DOJ Obtained a Court-Authorized Search Warrant

Through further investigation, the FBI uncovered multiple sources of evidence indicating that the response to the May 11 grand jury subpoena was incomplete and that classified documents remained at the Premises, notwithstanding the sworn certification made to the government on June 3. In particular, the government developed evidence that a search limited to the Storage Room would not have uncovered all the classified documents at the Premises. The government also developed evidence that government records were likely concealed and removed from the Storage Room and that efforts were likely taken to obstruct the government's investigation. *See also* MJ Docket D.E. 80 at 8 ("As the Government aptly noted at the hearing, these concerns are not hypothetical in this case. One of the statutes for which I found probable cause was 18 U.S.C. § 1519, which prohibits obstructing an investigation."). This included evidence indicating that boxes formerly in the Storage Room were not returned prior to counsel's review.

Against that backdrop, and relying on the probable cause that the investigation had developed at that time, on August 5, 2022, the government applied to Magistrate Judge Reinhart for a search and seizure warrant, which cited three statutes: 18 U.S.C. § 793 (Willful retention of national defense information), 18 U.S.C. § 2071 (Concealment or removal of government records), and 18 U.S.C. § 1519 (Obstruction of federal investigation).[5] *See* MJ Docket, D.E. 57 at 3. On the same date, Judge Reinhart found that probable cause existed that evidence of each of the crimes would be found at the Premises, and he authorized the search warrant. MJ Docket, D.E. 17 at 2.

Pursuant to the search warrant, the government was permitted to search the "'45 Office' [the former President's office space at the Premises], all storage rooms, and all other rooms or areas within the premises used or available to be used by [the former President] and his staff and in which boxes or documents could be stored, including all structures or buildings on the estate" but not "areas currently (i.e., at the time of the search) being occupied, rented, or used by third parties (such as Mar-a-Largo Members) and not otherwise used or available to be used by [the former President] and his staff, such as private guest suites." MJ Docket, D.E. 17 at 3. Judge Reinhart authorized the government to seize any evidence of the applicable crimes. *Id.* at 2, 4. Importantly, the government was authorized by the warrant to

---

[5] Plaintiff states that "[t]here is no criminal enforcement mechanism or penalty" in the Presidential Records Act, and then suggests that DOJ may have "recognize[d] that deficiency, and then decide[d] to re-categorize this case as relating to national security materials[ ]simply to manufacture a basis to seek a search warrant" and may have "mischaracterize[d] the types of documents it sought." D.E. 1 at 12. These accusations are belied by the statutes cited in the government's search warrant, which make clear that this investigation is not simply about efforts to recover improperly retained Presidential records. Moreover, 18 U.S.C. § 2071 criminalizes the concealment or removal of government records, including Presidential records.

seize "[a]ny physical documents with classification markings, along with any containers/boxes (including any other contents) in which such documents are located, as well as any other containers/boxes that are collectively stored or found together with the aforementioned documents and containers/boxes" and any government or Presidential records created during the former President's Administration. *Id.* at 4.

### H. During the August 8 Execution of the Search Warrant at the Premises, the Government Seized Thirty-Three Boxes, Containers, or Items of Evidence, Which Contained over a Hundred Classified Records, Including Information Classified at the Highest Levels

Pursuant to the above-described search protocols, the government seized thirty-three items of evidence, mostly boxes (hereinafter, the "Seized Evidence"), falling within the scope of Attachment B to the search warrant because they contained documents with classification markings or what otherwise appeared to be government records. Three classified documents that were not located in boxes, but rather were located in the desks in the "45 Office," were also seized. Per the search warrant protocols discussed above, the seized documents included documents that were collectively stored or found together with documents with classification markings.[6]

The investigative team has reviewed all the materials in the containers that the privilege review team did not segregate as potentially attorney-client privileged. Of the Seized

---

[6] Plaintiff repeatedly claims that his passports were outside the scope of the warrant and improperly seized, and that the government, in returning them, has admitted as much. *See* D.E. 1 at 2 & n.2; D.E. 28 at 3, 8, 9. These claims are incorrect. Consistent with Attachment B to the search warrant, the government seized the contents of a desk drawer that contained classified documents and governmental records commingled with other documents. The other documents included two official passports, one of which was expired, and one personal passport, which was expired. The location of the passports is relevant evidence in an investigation of unauthorized retention and mishandling of national defense information; nonetheless, the government decided to return those passports in its discretion.

Evidence, thirteen boxes or containers contained documents with classification markings, and in all, over one hundred unique documents with classification markings—that is, more than twice the amount produced on June 3, 2022, in response to the grand jury subpoena—were seized. Certain of the documents had colored cover sheets indicating their classification status. *See, e.g.,* Attachment F (redacted FBI photograph of certain documents and classified cover sheets recovered from a container in the "45 office"). The classification levels ranged from CONFIDENTIAL to TOP SECRET information, and certain documents included additional sensitive compartments that signify very limited distribution. In some instances, even the FBI counterintelligence personnel and DOJ attorneys conducting the review required additional clearances before they were permitted to review certain documents.

Notwithstanding counsel's representation on June 3, 2022, that materials from the White House were only located in the Storage Room, classified documents were found in both the Storage Room and in the former President's office. Moreover, the search cast serious doubt on the claim in the certification (and now in the Motion) that there had been "a diligent search" for records responsive to the grand jury subpoena. In the storage room alone, FBI agents found 76 documents bearing classification markings. All of the classified documents seized in the August 8 search have been segregated from the rest of the seized documents and are being separately maintained and stored in accordance with appropriate procedures for handling and storing classified information. That the FBI, in a matter of hours, recovered twice as many documents with classification markings as the "diligent search" that the former President's counsel and other representatives had weeks to perform calls into serious question the representations made in the June 3 certification and casts doubt on the extent of cooperation in this matter.

## I.   The Privilege Review Team Has Completed Its Work

The privilege review team has completed its review of the materials in its custody and control that were identified as potentially privileged. The privilege review team identified only a limited subset of potentially attorney-client privileged documents. Pursuant to the court-approved filter protocols, the privilege review team was permitted to

> (a) apply *ex parte* to the court for a determination whether or not the documents contain attorney-client privileged material; (b) defer seeking court intervention and continue to keep the documents inaccessible to law-enforcement personnel assigned to the investigation; or (c) disclose the documents to the potential privilege holder, request the privilege holder to state whether the potential privilege holder asserts attorney-client privilege as to any documents, including requesting a particularized privilege log, and seek a ruling from the court regarding any attorney-client privilege claims as to which the Privilege Review Team and the privilege-holder cannot reach agreement.

MJ Docket D.E. 102-1 at ¶ 84.

Having completed its review of materials identified as potentially privileged, the privilege review team is prepared, pending direction from the Court, to proceed in accordance with the above procedures.

### Argument

## I.   Plaintiff Lacks Standing to Seek Judicial Oversight and Related Relief in Relation to Any Presidential Records Seized from the Premises

Plaintiff asks for a special master and related relief in anticipation of moving for the return of property under Criminal Rule 41(g). As he asserted: "[T]he requested relief is necessary to ensure that Movant can properly evaluate and avail himself of the important protections of Rule 41 of the Federal Rules of Criminal Procedure, particularly the ability to move for the return of seized property under Rule 41(g)." D.E. 28 at 4.

But, "[i]n order for an owner of property to invoke Rule 41(g), he must show that he had a possessory interest in the property seized by the government." *United States v. Howell*,

425 F.3d 971, 974 (11th Cir. 2005); *see also Richey v. Smith*, 515 F.2d 1239, 1243-44 (5th Cir. 1975) (court must consider "whether the plaintiff has an individual interest in and need for the material whose return he seeks");[7] 3A Charles Alan Wright and Sarah N. Welling, Fed. Prac. & Proc. § 690, at 248 (4th ed. 2010).

Plaintiff has no property interest in any Presidential records (including classified records) seized from the Premises. The Presidential Records Act provides—under a heading entitled "Ownership of Presidential records"—that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records." 44 U.S.C. § 2202; *see Citizens for Responsibility & Ethics in Wash. v. Trump*, 924 F.3d 602, 603 (D.C. Cir. 2019) (the PRA "establishes the public ownership of records created by . . . presidents and their staffs in the course of discharging their official duties" (brackets and internal quotations omitted)). And Presidential Records include any "documentary materials" that were "created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President" while "conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2).

Neither of Plaintiff's filings addresses or even cites that statutory provision. Nor does Plaintiff offer any other colorable argument that he has a property interest in any Presidential records seized. Plaintiff's Motion, in fact, asserts that "[t]he documents seized at Mar-a-Lago

---

[7] Pre-October 1, 1981 Fifth Circuit decisions are binding precedent in this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

on August 8, 2022 . . . were created during his term as President." D.E. 1 at 15. These are precisely the types of documents that likely constitute Presidential records.

Because these records do not belong to Plaintiff, Rule 41(g) gives him no right to have them returned. And because Plaintiff has no such right, this Court should not appoint a special master to review Presidential records for the purpose of entertaining potential claims of executive privilege. At most, Plaintiff can seek return of his *personal* property.

## II.     Plaintiff Is Not Entitled to the Return of Property or to Injunctive Relief

### A. Plaintiff Is Not Entitled to the Return of Any Property

As his last claim for relief, Plaintiff asks this Court to order "the Government to return any item seized pursuant to the Search Warrant that was not within the scope of the Search Warrant." D.E. 28 at 10; *see id*. at 4. In Plaintiff's view, retaining such material "would amount to a violation of the Fourth Amendment's protections against wrongful searches and seizures." D.E. 28 at 9. Although Plaintiff does not specify what material he contends was seized in excess of the search warrant, certain personal effects were commingled with classified material in the Seized Evidence, and they remain in the custody of the United States because of their evidentiary value. Personal effects without evidentiary value will be returned.

Nonetheless, contrary to Plaintiff's contention, personal effects in these circumstances are not subject to return under Criminal Rule 41(g), for four independent reasons. *First*, the search warrant authorized seizing and retaining items in containers/boxes in which documents with classification markings were stored. *See* MJ Docket D.E. 17 at 4. Evidence of commingling personal effects with documents bearing classification markings is relevant evidence of the statutory offenses under investigation.

*Second*, even if the personal effects were outside the scope of the search warrant

(contrary to fact), their seizure and retention would not violate the Fourth Amendment because they were commingled with documents bearing classification markings that were indisputably within the scope of the search warrant. *See, e.g., United States v. Wuagneux*, 683 F.2d 1343, 1353 (11th Cir. 1982) ("It was also reasonable for the agents to remove intact files, books and folders when a particular document within the file was identified as falling with the scope of the warrant. To require otherwise 'would substantially increase the time required to conduct the search, thereby aggravating the intrusiveness of the search.'" (citation omitted)).

*Third*, even if the personal effects were seized in excess of the search warrant—which Plaintiff has not established—Criminal Rule 41(g) does not require their return because that Rule was amended in 1989 to recognize that the United States may retain evidence collected while executing a warrant in good faith. *See, e.g., Grimes v. CIR*, 82 F.3d 286, 291 (9th Cir. 1996). As the Advisory Committee explained in connection with the 1989 amendment of Criminal Rule 41(e) (now subsection (g)), Supreme Court precedent permits "evidence seized in violation of the fourth amendment, but in good faith pursuant to a warrant," to be used "even against a person aggrieved by the constitutional violation," and "Rule 41(e) is not intended to deny the United States the use of evidence permitted by the fourth amendment and federal statutes." The decoupling of Criminal Rule 41(g) from the Fourth Amendment also explains why a motion to return property provides no forum to litigate the scope of a search warrant: failure to comply with a search warrant or the Fourth Amendment is neither necessary nor sufficient to prove a movant's entitlement to the return of property under Criminal Rule 41(g).

*Fourth*, and independent of the three foregoing reasons, the former President could obtain the return of his personal effects under Criminal Rule 41(g) only if he satisfies the four-part *Richey* test. That decision established four factors that inform whether courts should entertain a Criminal Rule 41 motion for return of property before the initiation of criminal proceedings: (1) whether the movant shows that government agents "displayed a callous disregard for . . . constitutional rights"; (2) whether the movant has an interest in and need for the material that he seeks; (3) whether he would be irreparably injured by denial of the property; and (4) whether he has an adequate remedy at law for his grievance. *Richey*, 515 F.2d at 1243-44 (cleaned up). Although the former President may have a property interest in his personal effects, he cannot demonstrate callous disregard of the Fourth Amendment considering the patient exhaustion of less-intrusive methods to obtain return of documents with classification markings from the Premises and FBI Special Agents' scrupulous adherence to the terms of the search warrant, which permitted them to seize the entire "containers/boxes" in which the documents with classification markings were stored, as well as other containers/boxes stored collectively. Moreover, the former President has not established irreparable injury in the deprivation of his personal property.

**B.  Plaintiff Is Not Entitled to Injunctive Relief**

To the extent Plaintiff seeks a preliminary injunction prohibiting the government from continuing to review seized materials while the Court considers his motion, *see* D.E. 1 at 14-15, such relief is wholly unwarranted.[8]

---

[8] Plaintiff's motion cites Federal Rule of Civil Procedure 26(b)(5) and (c)(1) and this Court's Local Rule 26.1(g) in support of this request. D.E. 1 at 15. These provisions relate to privilege claims during pre-trial discovery in civil cases, not privilege claims regarding materials seized pursuant to a search warrant. The former President's request is more properly construed as a request for a preliminary injunction under Federal Rule of Civil Procedure 65.

"A party seeking a preliminary injunction must establish that (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Vital Pharmaceuticals, Inc. v. Alfieri*, 23 F.4th 1282, 1290-91 (11th Cir. 2022) (internal quotations omitted). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Id.* at 1291 (internal quotations omitted).

For the reasons discussed below, the former President has not established a likelihood of success on the merits. As to the second condition for injunctive relief, the former President has failed to establish that he would suffer any injury absent an injunction—let alone an irreparable injury. First, any Presidential records seized pursuant to the search warrant belong to the United States, not to the former President. 44 U.S.C. § 2202. As such, the former President cannot claim that he is personally injured by a review of those records by personnel within the Executive Branch. *See also Nixon v. Administrator of General Services*, 433 U.S. 425, 451 (1977) ("*Nixon v. GSA*") (review of Presidential records by "personnel in the Executive Branch sensitive to executive concerns" "constitutes a very limited intrusion" into confidentiality of former President's records). Second, even if review of these materials by personnel within the Executive Branch constituted an injury to the former President, that injury would already be complete. As described above, personnel within the Case Team have already reviewed all of the seized materials except those withheld pursuant to the filter protocol. *See supra* at 3, 13. Moreover, as the government notified the Court yesterday, DOJ and the Office of the Director of National Intelligence ("ODNI") are currently facilitating a

19

classification review of these materials, and ODNI is leading an Intelligence Community assessment of the potential risk to national security that would result from the disclosure of these materials. D.E. 31 at 2-3. Any possible injury is thus, at most, an incremental and theoretical "harm" based on further review of materials that the Case Team has already reviewed and inventoried.

Finally, the fact that the former President filed this motion two weeks after the search occurred—and only just effected service on the United States on August 29—"militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). "[T]he very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.* That is why "district courts within this Circuit and elsewhere have found that a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Id.* (citing cases). Although courts have generally considered delays of "a few months" or more as a factor against granting injunctive relief, *id.*, a delay of two weeks in this particular context is significant. Typically, parties who seek the appointment of a special master following the execution of a search warrant make such requests immediately. For example, after FBI agents executed search warrants on April 9, 2018, at various properties belonging to Michael Cohen, who had served as private counsel to then-President Trump, Cohen's counsel sent a letter *on the same day* to the United States Attorney's Office requesting an opportunity to review the seized materials and contending that documents subject to attorney-client privilege "should be protected from government review."[9] After that request was denied, Cohen filed a motion for a temporary restraining

---

[9] Exhibit A to Decl. of Todd Harrison in Support of an Order to Show Cause, *Cohen v. United*

order on April 12 or April 13, 2018.[10] Then-President Trump himself moved to intervene in

the proceedings on April 15, 2018—just six days after the search.[11] The need for promptness

when a party seeks appointment of a special master is obvious: the government may begin

reviewing materials as soon as they are seized, and a delay of even two weeks may well

mean—as it does here—that the government has reviewed all of the seized materials by the

time relief is sought. The former President's delay in filing this motion thus strongly "militates

against a finding of irreparable harm." *Wreal*, 840 F.3d at 1248.

As to the third requisite for injunctive relief, "the threatened injury to the movant" is

far outweighed by the "damage the proposed injunction may cause" to the government. *Vital*

*Pharmaceuticals*, 23 F.4th at 1291 (internal quotations omitted). DOJ is in the midst of an

ongoing criminal investigation pertaining to potential violations of the Espionage Act, 18

U.S.C. § 793(e), as well as obstruction of justice, 18 U.S.C. § 1519, and unlawful concealment

or removal of government records, 18 U.S.C. § 2071. The Intelligence Community is also

reviewing the seized documents to assess the potential risk to national security that would

result if these materials were disclosed while they were unlawfully stored at the Premises. An

injunction barring any further review of these documents would therefore not only hinder an

ongoing criminal investigation, but would also thwart entirely an ongoing and sensitive

---

*States*, No. 1:18-MJ-3161, D.E. 7-1 (S.D.N.Y. Apr. 13, 2018).

[10] *See* Mem. of Law in Support of Michael D. Cohen's Order to Show Cause and a Temporary Restraining Order, *Cohen*, No. 1:18-MJ-3161, D.E. 6 (S.D.N.Y. Apr. 13, 2018). Although this filing was docketed on April 13, 2018, the text of the motion is dated April 12, 2018, *id.* at 28, and a declaration from Cohen's attorney asserts that counsel for Cohen notified the U.S. Attorney's Office on April 12, 2018 that it intended to file the application, *see* Harrison Decl., *Cohen*, No. 1:18-MJ-3161, D.E. 7 at 7 (S.D.N.Y. Apr. 13, 2018).

[11] *See* Letter Motion, *Cohen v. United States*, No. 1:18-MJ-3161, D.E. 8 (S.D.N.Y. Apr. 15, 2018).

review of risks to national security. For the same reasons, an injunction would plainly be "adverse to the public interest." *Vital Pharmaceuticals*, 23 F.4th at 1291.

III.   **Even if the Former President Had Standing, the Appointment of a Special Master Would Be Unnecessary and Would Interfere with Legitimate Government Interests**

As described above, the government's privilege review team has already identified any materials potentially subject to attorney-client privilege, and the government's investigative team has already reviewed all of the materials that were not segregated by the privilege review team. Appointment of a special master to review potential privilege claims in either category is therefore unnecessary. It would do little or nothing to protect any legitimate interests that Plaintiff may have while impeding the government's ongoing criminal investigation, as well as the Intelligence Community's review of potential risks to national security that may have resulted from the improper storage of the seized materials.

A.   **Federal Rule of Civil Procedure 53 Counsels Against Appointment of a Special Master in Circumstances Such as These**

In this procedural posture, a special master can be appointed, without the parties' consent, only to address "pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). "[R]eference to a master under Rule 53 is to be the exception and not the rule." *Hayes v. Foodmaker*, Inc., 634 F.2d 802, 803 (5th Cir. Unit A 1981) (per curiam) (citing *La Buy v. Howes Leather Co.*, 352 U.S. 249, 257-58 (1957)). Rule 53(a)(1)(C)'s "restrictive language"— limiting appointments to cases where judges cannot "effectively" or "timely" address issues themselves—"carries forward the traditional notion that masters are the exception, not the usual or common practice." 9C Charles Alan Wright and Arthur R. Miller, Fed. Prac. & Proc. § 2602.1 (3d ed.).

## B. Appointment of a Special Master Is Neither Necessary nor Appropriate to Address Executive Privilege in this Case

The former President asserts (D.E. 1 at 14-16) that review by a special master is necessary because the records at issue are presumptively subject to executive privilege. But even if the former President had actually asserted executive privilege with regard to any of the seized documents (which he has not), and even if he had statutory authority to do so (which is not established), such an assertion would fail here because this case involves the recovery and review of executive records by executive officials performing core executive functions. The Supreme Court has made clear that a former President may not successfully assert executive privilege "against the very Executive Branch in whose name the privilege is invoked." *Nixon v. GSA*, 433 U.S. at 447-48. And even if there might be some extraordinary circumstance in which a former President could successfully assert executive privilege against the Executive Branch, this case plainly would not qualify: the seized materials—and, in particular, any such materials marked as classified—are essential to a criminal investigation into the handling of the records themselves, and the government is also reviewing those highly sensitive records to determine whether their handling created risks to national security. Those vital Executive Branch needs far outweigh any limited burden on the general interests served by the executive privilege. Finally, appointment of a special master in these circumstances would be inconsistent with basic principles of equity.

### 1. A former President cannot successfully assert executive privilege against the Executive Branch in its performance of executive functions.

Even if the former President had attempted to assert executive privilege (which he has not done),[12] that assertion would not justify any restrictions on Executive Branch access to

---

[12] Plaintiff's motion does not purport to include any assertion of executive privilege by the

the documents here. Executive privilege is "inextricably rooted in the separation of powers under the Constitution," *United States v. Nixon*, 418 U.S. at 708, and it "derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities," *Nixon v. GSA*, 433 U.S. at 447. The privilege exists "not for the benefit of the President as an individual, but for the benefit of the Republic." *Id.* at 449. Consistent with the privilege's function of protecting the Executive Branch as an institution, it may be invoked in appropriate cases to prevent the sharing of materials *outside* the Executive Branch—*i.e.*, with Congress, the courts, or the public. *Cf. Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (per curiam) (noting unresolved questions about whether and under what circumstances a former President can invoke the privilege to prevent such "disclosure"—there, to Congress). Yet the former President cites no case—and the government is aware of none—in which executive privilege has been successfully invoked to prohibit the sharing of documents *within* the Executive Branch.

    To the contrary, in what appears to be the only case in which such an assertion has ever been made, *Nixon v. GSA*, the Supreme Court rejected former President Nixon's assertion that a statute requiring the General Services Administration[13] to take custody of and review

---

former President; instead, it refers (at 15) to "potentially privileged materials" and appears to suggest that a special master should determine in the first instance whether the privilege applies. Plaintiff's assertion that because the documents "were created during his term as President," they are "'presumptively privileged' until proven otherwise," D.E. 1 at 15 (quoting *United States v. Nixon*, 418 U.S. 683, 713 (1974)), is therefore incorrect. That presumption arises only "[u]pon receiving a claim of privilege from the Chief Executive." *United States v. Nixon*, 418 U.S. at 713. Additionally, a former President can invoke executive privilege only with respect to communications made "'in performance of [the President's] responsibilities.'" *Nixon v. GSA*, 433 U.S. at 449 (quoting *United States v. Nixon*, 418 U.S. at 711).

[13] At the time *Nixon v. GSA* was litigated, the National Archives was a part of the General Services Administration.  In 1985, Congress created the National Archives and Records Administration as a separate agency.

recordings and documents created during his presidency violated either the separation of powers or executive privilege. 433 U.S. at 433-36. Addressing the separation of powers, the Court emphasized that the Administrator of the GSA "is himself an official of the Executive Branch," and that the GSA's "career archivists" are likewise "Executive Branch employees." *Id.* at 441. The Court rejected the former President's invocation of privilege against the statutorily required review by the GSA, describing it as an "assertion of a privilege against the very Executive Branch in whose name the privilege is invoked." *Id.* at 447-48. The Court explained that the relevant question was whether review by Executive Branch officials within the GSA would "impermissibly interfere with candid communication of views by Presidential advisers." *Id.* at 451. And it held that the question was "readily resolved" because the review in question was "a very limited intrusion by personnel in the Executive Branch sensitive to executive branch concerns." *Id.*

Additionally, the framework set forth in the PRA and its implementing regulations providing for the assertion of privileges by a former President, including executive privilege, *see* 44 U.S.C. §§ 2205(2), 2208; 36 C.F.R. § 1270.44(a) and (d), is inapplicable here.[14] First, Plaintiff did not convey the seized materials to NARA as required by the PRA. As such, he cannot now maintain that he has a statutory right to make privilege assertions pursuant to

---

[14] Plaintiff also cites *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991) for the proposition that he has "virtually complete control" over Presidential records during his term of office, *see* D.E. 1 at 12, but *Armstrong* is wholly inapposite. The court in that case was discussing control of Presidential records by a sitting President, not a former President. *See id.* As the sources relied upon by *Armstrong* make clear, that control terminates at the end of the President's time in office. *Id.* (citing H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. 2 (1978), reprinted in U.S.C.C.A.N. 5732, 5733); *see id.* at 291 (explaining that the PRA provides for "presidential control of records creation, management, and disposal *during the President's term of office*" and "public ownership and access to the records *after the expiration of the President's term*.") (emphases added).

that law. Second, even if the PRA process were available to Plaintiff, it does not follow that he could successfully assert executive privilege *against the Executive Branch*. To the contrary, the PRA makes clear that it does not expand the scope of executive privilege. *See* 44 U.S.C. § 2204(c)(2) ("Nothing in this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President."). As just discussed, the only time executive privilege was asserted against the Executive Branch by a former President, the Supreme Court rejected it. *Nixon v. GSA*, *supra*.

These principles resolve the former President's request for a special master. As in *Nixon v. GSA*, this case involves potential assertions of executive privilege by a former President against the "Executive Branch in whose name the privilege is invoked." 433 U.S. at 447-48. This case does not implicate any disclosure outside the Executive Branch, and the review of the records at issue is being conducted "by personnel in the Executive Branch sensitive to executive concerns." *Id.* at 451; *see also id.* at 444 ("[I]t is clearly less intrusive to place custody and screening of the materials within the Executive Branch itself than to have Congress or some outside agency perform the screening function."). Accordingly, even in a case where records might be withheld from the *public* pursuant to a valid assertion of privilege, there would not be a basis for withholding them from review by the Executive Branch itself in pursuit of its core executive functions.

### 2. Even if a former President could in some circumstances assert executive privilege against the Executive Branch, no such assertion would be valid here.

In any event, even if there could be some extraordinary circumstance in which a former President could validly assert executive privilege against the Executive Branch itself, this case plainly would not qualify. The Executive Branch is reviewing the records at issue in furtherance of two core executive functions: investigating the potential unlawful handling of

the records, including highly classified records, and assessing the resulting risks to national security. Access to the records is essential to the performance of those functions. And those vital Executive Branch interests far outweigh any burden on the institutional interests the privilege serves to protect—particularly where, as here, the former President has not even attempted to establish any particularized harm from the review of specific records.

In *United States v. Nixon*, the Supreme Court held that the need for evidence in a criminal trial outweighed even a sitting President's assertion of executive privilege over presidential communications. The Court explained that, although the "[t]he interest in preserving confidentiality is weighty indeed and entitled to great respect," 418 U.S. at 712, assertions of the privilege must also "be considered in light of our historic commitment to the rule of law. This is nowhere more profoundly manifest than in our view that the twofold aim (of criminal justice) is that guilt shall not escape or innocence suffer," *id.* at 708-709 (internal quotations omitted). Ultimately, the Court concluded that "[t]he generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." *Id.* at 713.

Similar logic applies here. The records at issue were seized pursuant to a search warrant reflecting a judicial finding of probable cause to believe that they constitute evidence of violations of statutes specifically governing the handling of government records in general and national defense information in particular. *See supra* at 11-12 (citing 18 U.S.C. §§ 793 and 2071, as well as 18 U.S.C. § 1519). The Executive Branch has a "demonstrated, specific need" for the records at issue, *Nixon*, 418 U.S. at 713, because the records—and particularly any records marked as classified—are central to the investigation. Indeed, they are the very subject of the relevant statutes. And, even more so than in *United States v. Nixon*, there is little risk that

the possibility of review in the highly unusual circumstances presented here would materially chill communications by future presidential advisers. *See* 418 U.S. at 712 (presidential advisors would not likely "be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution"). To the contrary, the Executive Branch's efforts here are designed to *ensure* the confidentiality and proper treatment of sensitive presidential records that were improperly stored—a process that should enhance, rather than undermine, future presidential communications.[15]

The Executive Branch's review here also serves another compelling interest that was not at issue in *Nixon*: The records at issue include sensitive and highly classified documents. As the government has explained, the Intelligence Community, under the supervision of the Director of National Intelligence, is conducting a classification review of those documents and an assessment of the potential risk to national security that could result from their disclosure. D.E. 31 at 2-3. That additional vital purpose provides yet further reason to conclude that the Executive Branch's interest in securing and reviewing the materials at issue here outweighs any limited burden on the confidentiality of presidential communications— and thus that the privilege would be overcome even if it were validly asserted. This Court should be particularly reluctant to order disclosure of highly classified materials to a special master absent an especially strong showing that such a step is necessary. *Cf. United States v. Reynolds,* 345 U.S. 1, 10-11 (1952) (courts should be cautious before requiring judicial review, even *ex parte* and *in camera*, of documents whose disclosure would jeopardize national

---

[15] Of course, as DOJ and other Executive Branch personnel conduct their review of the seized materials, they will continue to be "sensitive to executive concerns" regarding confidentiality. *Nixon v. GSA*, 433 U.S. at 452.

security).

### 3. Appointment of a special master to review materials for claims of executive privilege would be inconsistent with principles of equity.

The former President has sought to invoke this Court's equitable jurisdiction, *see* D.E. 1 at 14; D.E. 28 at 1, 6-8, but appointment of a special master to review the seized materials for claims of executive privilege would be fundamentally inequitable. First, to the extent the former President's arguments rest on a claim that he has been deprived of his rights under the PRA to assert potential privilege claims, *see* D.E. 1 at 12, the former President forfeited the ability to rely on the PRA by failing to provide his records to NARA, as the law requires. Had the seized records been returned to NARA—upon the former President's departure from office, or during the many months afterward in which NARA sought return of the missing records—Plaintiff could have at least tendered a claim of executive privilege to the Archivist with regard to any materials sought by DOJ. Indeed, that is precisely what occurred when DOJ sought access to the fifteen boxes that were returned to NARA in January 2022. *See supra* at 7.[16] As described above, the government resorted to a search warrant only after the former President failed to return missing records as requested by NARA and then as required by a grand jury subpoena. *See supra* at 4-5, 8-10. The government's seizure of these records through use of a search warrant is a direct result of Plaintiff's own conduct, and this "inequitable conduct" "make[s] equitable relief inappropriate." *Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022).

Second, for the reasons described above, the government has an urgent interest in

---

[16] Notably, however, the former President never interposed any executive privilege objection to returning the set of classified documents that was provided by his custodian of records on June 3.

continuing its review of these materials, both for purposes of its criminal investigation and to assess potential national security risks caused by improper storage of classified records. Appointment of a special master would undoubtedly delay both processes—including because a special master would likely need to obtain a security clearance and specific authorization from relevant entities within the Intelligence Community to review particularly sensitive materials.

Third, appointment of a special master for purposes of reviewing executive privilege claims is not necessary to protect any personal rights belonging to the former President. Unlike possible assertions of attorney-client privilege by the former President with respect to his personal counsel, which is a personal right that belongs to the client, *see, e.g.*, *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 62 (7th Cir. 1980), executive privilege exists not "for the benefit of the President as an individual, but for the benefit of the Republic," *Nixon v. GSA*, 433 U.S. at 449. In any event, as discussed above, the investigative team has already reviewed all of the seized materials that were not segregated by the filter team. Restricting further review by the government—including by the Intelligence Community—would therefore do little to protect Plaintiff's purported interests or rights.

## C.   This Case Does Not Involve the Search of an Attorney's Office and the Attorney-Client Privilege Issues Presented Are Not Complex, Voluminous, or Novel

The appointment of a special master is not necessary to adjudicate potential attorney-client privilege issues. "[I]t is well-established that filter teams—also called 'taint teams'—are routinely employed to conduct privilege reviews." *In re Sealed Search Warrant & Application for a Warrant by Tel. or Other Reliable Elec. Means*, No. 20-MJ-3278, 2020 WL 6689045, at *2 (S.D. Fla. Nov. 2, 2020) (citing multiple Eleventh Circuit cases approving the use of filter teams), *aff'd*, 11 F.4th 1235 (11th Cir. 2021). Tellingly, the cases relied upon by the former President

that have employed special masters rather than filter teams invariably involve the search of law offices. *See* D.E. 1 at 18-19; D.E. 28 at 5-6. The former President analogizes searches of law offices to the present search by claiming that they are "contexts involving similar matters of privilege." D.E. 1 at 18. Looking at the cases he cites, however, and the reasons why special masters have been appointed when law offices have been searched, it becomes clear that searches of law offices and the instant search do not at all involve similar privilege concerns.

The cases cited by the former President involve thorny issues presented by searches of law firms. In particular, courts have cited the complexities posed when materials are seized from attorneys involving multiple clients. *See, e.g., In Re: Search Warrant Issued June 13, 2019*, 942 F.3d 159, 166-67 (4th Cir. 2019) ("The electronically seized materials contained all of Lawyer A's email correspondence, including email correspondence related to Client A and numerous other Law Firm clients. More specifically, Lawyer A's seized email inbox contained approximately 37,000 emails, of which 62 were from Client A or contained Client A's surname."); *see id.* at 178 ("[T]he judge may well have rejected the Filter Team and its Protocol if the judge had known (1) that 99.8 percent of the 52,000 seized emails were not from Client A, were not sent to Client A, and did not mention Client A's surname; and (2) that many of those seized emails contained privileged information concerning other clients of the Law Firm."); *id.* at 181 (citing other cases involving the appointment of a special master, all of which involved searches of attorney offices); *In re Sealed Search Warrant & Application for a Warrant by Tel. or Other Reliable Elec. Means*, 2020 WL 6689045, at *2 ("As Judge O'Sullivan aptly noted, '[m]ost of the cases cited by the movants concern the searches of criminal defense attorneys or law firms that performed some criminal defense work' . . . . Indeed, those cases involved different concerns than those posed by the case at hand, as there was a risk that the

members of the filter team would at some point be involved in the criminal investigation and/or prosecution of other clients who were not the subject of the underlying investigation."); *United States v. Stewart,* No. 02-CR-395, 2002 WL 1300059, at *3 (S.D.N.Y. June 11, 2002) ("Both parties also rightly agree that law office searches raise special concerns . . . .); *In re Search Warrants Executed on April 28, 2021*, No. 1:21-MC-425, D.E. 1 at 2 (S.D.N.Y. May 4, 2021) ("[U]nder certain exceptional circumstances, the appointment of a special master to review materials seized from an attorney may be appropriate. Those circumstances may exist where the search involves the files of a criminal defense attorney with cases adverse to the United States Attorney's Office . . . ."); *see also United States v. Abbell*, 914 F. Supp. 519, 519 (S.D. Fla. 1995) (describing the "responsiveness and privilege issues raised" in the search of a law firm office as "exceptional").[17]

The attorney-client privilege issues in this case present none of the complexities associated with a search of a law firm. This is not a case where a U.S. Attorney's office has seized materials related to multiple clients who may also be under investigation by the same office. Moreover, as noted above, the volume of documents is small, and the government's filter team has already completed its review of them. It is prepared to follow the procedures set forth in the warrant, and introducing a special master would only result in delay to the process.

---

[17] The former President also cites to a Justice Manual provision, "9-13.420 § F," for the proposition that prosecutors must consider "[w]ho will conduct the review, i.e., a privilege team, a judicial officer, or a special master." He fails to mention that this provision is under a provision that is specific to searches of attorney offices; Section 9-13.420 is titled "Searches of Premises of Subject Attorneys." This provision reinforces that searches of attorney offices are uniquely fraught and may require different procedures than the searches of non-attorney premises such as this one.

### D. The Court Should Not Appoint a Special Master, But if It Does, the Below Conditions Should Apply

For all the above reasons, the Court should not appoint a special master. If the Court decides to do so, as directed by the Court, the government proposes the following conditions.

First, the Court should direct the parties to confer and submit a joint list of proposed candidates by September 7, 2022.

Second, the special master should be required to submit an affidavit concerning any potential bases for disqualification before this Court issues an appointment order. *See* Fed. R. Civ. P. 53(b)(3)(A).

Third, the Court should specify the following duties and impose the following limitations:

- The special master's duties should be limited to assessing Plaintiff's claims of attorney-client privilege over the set of potentially privileged documents identified by the Privilege Review Team. Fed. R. Civ. P. 53(b)(2)(A). For the reasons articulated above, there is no precedent or basis for appointing a special master to review documents for executive privilege and barring current Executive Branch law enforcement officials or officers from continuing to access that material, including to assess national security risks.

- If the special master must be permitted to review classified documents, in order to avoid unnecessary delay, the special master should already possess a Top Secret/SCI security clearance.

- The special master should be allowed to communicate *ex parte* with the Court or either party to facilitate the review, although all final decisions must be provided to both parties to allow for either party to seek the Court's review. Fed. R. Civ. P. 53(b)(2)(B).

- Any documents that reflect the special master's rulings, including orders, privilege logs, or other records, should be preserved and filed under seal with the Court but made available to both parties. Fed. R. Civ. P. 53(b)(2)(C).

- The parties should have 10 days, after receiving notice of a final order or decision, to seek Court review, instead of the typical 21-day period. Fed. R. Civ. P. 53(b)(2)(D), (f)(2). As Rule 53 provides, the Court should review both legal and factual issues de novo, *see* Fed. R. Civ. P. 53(f)(3); because the central disputed issues concern privilege, an issue that courts traditionally decide, there is no need to apply any deferential standard of review to the special master's determinations. The Court should also review procedural issues de novo for the same reason, contrary to the default rule provided by Rule 53(f)(5).

- The Court should impose a deadline for the special master's review, with final decisions on all disputed documents to be made by September 30, 2022. As discussed above, the volume of material at issue is not large.

## Conclusion

For the foregoing reasons, the Court should deny Plaintiff's Motion for Judicial Oversight (D.E. 1) and decline to require the return of seized items, enjoin further review of seized materials, or appoint a special master.

Respectfully submitted,

/s *Juan Antonio Gonzalez*
JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY
Florida Bar No. 897388
99 NE 4th Street, 8th Floor
Miami, FL 33132
Tel: 305-961-9001
Email: juan.antonio.gonzalez@usdoj.gov


 /s *Jay I. Bratt*
JAY I. BRATT
CHIEF
Counterintelligence and Export Control
Section
National Security Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Illinois Bar No. 6187361
Tel: 202-233-0986
Email: jay.bratt2@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I caused the attached document to be electronically transmitted to the Clerk's Office using the CM/ECF system for filing and transmittal of a notice of electronic filing.

*/s Juan Antonio Gonzalez*
JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY
Florida Bar No. 897388
99 NE 4th Street, 8th Floor
Miami, FL 33132
Tel: 305-961-9001
Email: juan.antonio.gonzalez@usdoj.gov
