UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 22-CV-81294-CANNON

DONALD J. TRUMP,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.

_____/

PLAINTIFF DONALD J. TRUMP'S PRINCIPAL BRIEF TO THE
SPECIAL MASTER ON GLOBAL ISSUES

     Pursuant to the Special Master's Order dated October 26, 2022, ECF 162, Plaintiff, President Donald J. Trump, through the undersigned counsel, files this letter brief on the "global issues" pertaining to the Special Master's review in this matter.

     Following the review of the documents at issue, the parties identified the following five "Global Issues" to brief before the Special Master review the materials seized from President Trump's residence at Mar-a-Lago:

-    Whether Plaintiff may designate records created or received during his administration as personal documents during or after his term in office;

-    Whether certain groups of documents (*e.g.*, pardon packages) are Presidential records;

-    Whether categorization of a document as a personal record means that it cannot be claimed by a former officeholder as subject to a claim of executive privilege;

-    Whether Plaintiff may assert executive privilege to withhold seized materials from the

1

government notwithstanding the four reasons and footnote in the government's letter with respect to the 15 Filter A documents filed on October 20, 2022; and

-   Whether Plaintiff should be required to file a declaration or affidavit regarding the government's inventory as set forth in ECF 118, at 1-2.

ECF 161-1 at 1.   This brief addresses each matter in turn.

## DISCUSSION

I.   **The Presidential Records Act authorizes a sitting President to designate records as personal records during his term in office.**

The Special Master has directed the Parties to brief the issue of "[w]hether Plaintiff may designate or convert Presidential records to personal ones during or after his term in office."   ECF 161-1.

As Plaintiff has explained in prior briefing, all government records are subject to either the Federal Records Act ("FRA") or the Presidential Records Act ("PRA").   "[N]o individual record can be subject to both statutes because their provisions are inconsistent." *Armstrong v. Exec. Office of the President*, 1 F.3d 1374, 1293 (D.C. Cir. 1993) ("*Armstrong II*") ("The FRA defines a class of materials that are federal records subject to its provisions, and the PRA describes another, mutually exclusive set of materials that are subject to a different, less rigorous regime.").

The PRA specifies a further distinction between Presidential records and personal records, requiring that "all material produced or received by the President, 'to the extent practicable,' be categorized as Presidential records or personal records upon their creation or receipt and be filed separately."   *Judicial Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 845 F. Supp. 2d 288, 291 (D.D.C. 2012) (quoting 44 U.S.C. § 2203(b)); *see also* 44 U.S.C. § 2201(2)-

(3).   The reason for this distinction is that the PRA pertains to the ownership, retention, or archiving of only Presidential records and not personal records.[1]

The question now before the Special Master is therefore whether a President has the authority to decide whether a document is a "Presidential record" or a "personal record." Both the plain language of the PRA and past court decisions answer this question in the affirmative.

As a general matter, the PRA tasks the President—and the President alone—with "tak[ing] all such steps as may be necessary" to ensure the proper documentation of the Presidency according to the law.   44 U.S.C. § 2203(a).   Pursuant to that obligation, the PRA further requires that "materials produced or received by the President . . . shall, to the extent practicable, be categorized as Presidential records or personal records upon their creation or receipt . . . ."  *Id.* § 2203(b).

The *Judicial Watch* decision provides an important model for the present case.   There, the U.S. District Court for District of Columbia assessed the designation of Clinton Administration records.   President Bill Clinton had engaged a historian to help create an "oral history" of his administration, and the historian recorded several dozen audiotapes of both conversations with President Clinton and his real-time participation in events while Clinton was acting as President (such as official telephone calls).   *Judicial Watch*, 845 F. Supp.

---

[1] The PRA defines "Presidential records" to mean "documentary materials . . . created or received by the President [or the President's staff] in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."   44 U.S.C. § 2201(2).   The term does not include "personal records," which the statute defines to mean "all documentary materials . . . of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."   *Id.* § 2201(3).

2d at 290.   President Clinton retained the tapes and did not deliver them to the National Archives and Records Administration ("NARA").   *Id.*   Instead, according to public reports, President Clinton stored the tapes in his sock drawer.[2]   A non-profit organization subsequently sued in federal court, arguing that the tapes documented official Presidential business and thus were Presidential records under the PRA.   *Id.* at 290-91.

Interpreting the PRA, the court stated, "[t]he only reference in the entire statute to the designation of records as personal versus Presidential . . . calls for the decision to be made by the executive." *Judicial Watch, Inc.*, 845 F. Supp. 2d at 300-01.   "Under the statute, this responsibility is left solely to the President."   *Id.* at 301.   Therefore, according to the *Judicial Watch* court, in allocating this responsibility to the President, the PRA neither obligates nor permits the Archivist to make initial designation decisions or to take control of records that the President has designated as personal records.   *See Id.* at 291, 300-01.

The PRA, then, is clear: a President determines whether a document constitutes a Presidential record or a personal record.

In this instance, President Trump exercised that authority.   As an initial matter, the PRA recognizes the President's authority to make this decision, and when that decision is made, it is not subject to challenge. There is no authority whatsoever for the notion that the Government can seize documents from a President, and simply declare that they are Presidential records.

Furthermore, Plaintiff is not referencing any authority to designate documents as

---

[2] CBS News, "Clinton's Secrets In His Sock Drawer" (Sept. 6, 2007), https://www.cbsnews.com/news/clintons-secrets-in-his-sock-drawer/.

Presidential records or personal records "after his term in office."   Rather, Plaintiff was authorized to—and did in fact—designate the seized materials as personal records while he served as President.   President Trump was still serving his term in office when the documents at issue were packed, transported, and delivered to his residence in Palm Beach, Florida.[3] Thus, when he made a designation decision, he was President of the United States; his decision to retain certain records as personal is entitled to deference, and the records in question are thus presumptively personal.

The contents of the seized materials underscore the fact that President Trump treated these papers as personal records.   The documents seized from Mar-a-Lago included ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████   However, the Special Master has not been tasked with assessing the correctness of President Trump's designations.   In other words, it is the President's designation—not the appearance or content of a given document—that is determinative.

And as demonstrated by the *Judicial Watch* decision, President Trump need not put forth documentary evidence of his designation decisions, because his conduct unequivocally confirmed that he was treating the materials in question as personal records, rather than Presidential records.   In *Judicial Watch*, President Clinton had declined to supply the records at issue to the National Archives and Records Administration ("NARA").   *Judicial Watch*,

---

[3] *See* Patricia Mazzei and Julia Echikson, *Trump has arrived in Palm Beach to begin life as a private citizen*, The New York Times (Jan. 20, 2021), available at https://www.nytimes.com/2021/01/20/us/trump-palm-beach.html (last accessed November 7, 2022).

845 F. Supp. 2d at 301.   The court did not conduct a searching review of when or why President Clinton opted for that course of action; instead, it merely noted that he had not provided the records to NARA, as would have been necessary had President Clinton designated them as Presidential records, and observed that NARA "decline[d] to revisit the President's classification decision."   *Id.*   As in that case, President Trump's "classification decision" between Presidential and personal was made through action: his decision not to supply the records to NARA confirms that he treated them as personal records.   And to reiterate, President Trump took this course of action while he was in office.

Once the President makes such a designation decision, the PRA contemplates one avenue for further review: civil litigation initiated by NARA challenging the guidelines or process utilized in a given designation decision.   Prior courts have determined that the PRA precludes judicial review of a President's creation, management, or disposal decisions.   *See Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991) ("*Armstrong I*") ("[T]he PRA precludes review of the President's recordkeeping practices and decisions.").   The statute "accords the President virtually complete control over his records during his term of office," to the extent, for example, that "neither the Archivist nor the Congress has the authority to veto the President's disposal decision."   *Id.*; *see also Citizens for Responsibility and Ethics in Washington v. Cheney*, 593 F. Supp. 2d 194, 198 (D.D.C. 2009) (noting that, in enacting the PRA, Congress "limited the scope of judicial review and provided little oversight authority for the President and Vice President's document preservation decisions").

Critically, the PRA does not give either the Archivist or any other official free rein to pursue criminal enforcement.   Instead, the PRA identifies one specific mechanism for

enforcing the law: civil litigation initiated by NARA. *See Judicial Watch, Inc.*, 845 F. Supp. 2d at 302; *see also* 44 U.S.C. §§ 2112, 3106; *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1294 (D.C. Cir. 1993) (noting that the "guidelines describing which *existing* materials will be treated as presidential records in the first place are subject to judicial review").

In sum, the PRA offers a comprehensive structure concerning the designation of documents, in which the decision of a President during that President's term is subject to complete deference and limited judicial review.   The law identifies one official who is authorized to designate documents as Presidential or personal—the sitting President during whose term the documents in question originated or were received.   The PRA identifies one mechanism for challenging the process utilized in making a President's designation decision—a civil lawsuit.

If the process utilized by a President is allegedly defective, the PRA spells out the remedy: instead of initiating a criminal investigation and executing a search warrant, the Government should simply have availed itself of this process, namely, by filing a civil action seeking to challenge the process by which President Trump designated the records as personal. In any case, President Trump's designation decisions made during his term of office cannot possibly form the basis for any criminal investigation—to the extent those decisions are subject to challenge under the PRA, that is an entirely civil matter.

The Government is likely to posit that such authority on the part of the President is inconsistent with the PRA's function as an effective archiving device.   But in reaching her conclusion in *Judicial Watch*, Judge Amy Berman Jackson raised particularly important questions addressing the nature of the President's authority under the statute.

At oral argument, Judge Berman Jackson asked counsel for the Government, "What is to prevent a President from frustrating the balance that the statute was trying to strike between his privacy and public access . . . ?  Let's say a President kind of maliciously overclassifies, what is the remedy?"  *Judicial Watch, Inc. v. Nat'l Archives and Records Admin*, No. 1:10-cv-01834 (D.D.C.), ECF 14 at 13 ("*Judicial Watch* Transcript").  In that instance, the Government appropriately responded that the PRA contemplates one avenue for challenging a designation decision—the process set forth under 44 U.S.C. §§ 2112 and 3106. *Id.*; *see also Judicial Watch, Inc.*, 845 F. Supp. 2d at 302. In the Government's words, that remedy is "what Congress chose, and that's the remedy the Court is bound by."  *Judicial Watch* Transcript at 13.  Alternatively, the Government noted that "if Congress believes that a President is wildly misclassifying information, it can pass a law to change the statutory structure . . . ."  *Id.* at 15.  Indeed, just yesterday, lawmakers in the U.S. House of Representatives introduced a new law—the "Presidential Records Certification Act"—that would require executive officials to attest to their compliance with the Presidential Records Act on a regular schedule.[4]

The Government's position in this matter is diametrically opposed to its approach in *Judicial Watch*.  There, the Government asserted the President's authority to designate documents as personal, acknowledged President Clinton's de facto designation decision, and stressed that the PRA does not support any avenue for challenging such a decision other than civil litigation initiated by the Archivist.  Here, the Government wrongfully charges that

---

[4] *See* House Committee on Oversight and Reform, "Chairwoman Maloney Introduces Legislation to Strengthen the Presidential Records Act" (Nov. 7, 2022), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/MALONE_250_xml.pdf.

President Trump lacked designation authority, did not make a designation decision, and should be compelled to return the materials via a criminal process with no relevance to the applicable statutes.[5]   In addition to being inconsistent, the Government's approach is not sustainable under the PRA.   Plaintiff had authority to designate the materials in question as personal records and did so, and any remedy must arise under the PRA.

Finally, the parties have also been directed to brief the matter of "[w]hether certain groups of documents (e.g., pardon packages) are Presidential records."   ECF 161-1 at 1. There is no basis to conclude that any of the materials transported to Mar-a-Lago are Presidential records.   As described above, once a President has designated a record as personal – as happened here – the inquiry ends regardless of the content of a given document. As discussed, to the extent NARA disagrees with the process of designation, its remedy is to bring a civil lawsuit.

## II.   President Trump can assert—and has properly asserted—executive privilege as to certain documents.

The Special Master has directed the parties to brief two matters related to executive privilege: first, "[w]hether categorization of a document as a personal record means that it

---

[5] The doctrine of judicial estoppel is an equitable doctrine that "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks omitted) (quoting 18 Moore's Federal Practice § 134.30, p.134-62 (3d ed. 2000)). Accordingly, under the doctrine, a party may not play "fast and loose" with the courts by "deliberately changing positions according to the exigencies of the moment." *Id.* (quoting *United States v. McCaskey*, 9 F.3d 368, 378 (CA5 1993)); *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (C.A.3. 1953). Under these equitable principles, the Government should not be permitted to maintain its current position that Plaintiff lacked designation authority under the PRA. This position directly contradicts the arguments previously asserted by the Government in *Judicial Watch*.

cannot be claimed by a former officeholder as subject to a claim of executive privilege," and second, "[w]hether Plaintiff may assert executive privilege to withhold seized materials from the government notwithstanding the four reasons and footnote in the government's letter with respect to the 15 Filter A documents filed on October 20, 2022."   ECF 161-1 at 1.

Generally, the Special Master need not reach these issues: Plaintiff designated the materials as personal records under the PRA. The Government's course of action is wholly deficient, circumventing the PRA's avenues for relief and opting for the unprecedented and extreme measure of enforcing a criminal search warrant on a former President.   It would, accordingly, be unnecessary for the Special Master or the district court to further parse the materials for which Plaintiff properly claimed executive privilege.

However, even if the Special Master were to reach the privilege issue, the Special Master should further conclude that Plaintiff can nonetheless assert—and has properly asserted—executive privilege with respect to some of those documents.

The concept of executive privilege flows from the authorities vested in the President by Article II of the Constitution. *Nixon v. Sampson*, 389 F.Supp. 107, 148 (D.D.C. 1975) ("Executive privilege is founded upon the public interest in the effective performance of the constitutional powers and duties assigned to the Executive Branch."). The Framers of the Constitution recognized the importance of protecting information held by the country's executives, even before the privilege had formal title. *In re Sealed Case*, 121 F.3d 729, 736 (D.D.C. 1997). For example, early courts ruled that executive actors retained the right to withhold documents that might reveal military secrets, the identity of government informers, and even information related to pending investigations. *Id.* at 736-37 (internal citations

omitted).

More recently, the Supreme Court has explicitly recognized the importance of protecting the information exchanged between "high Government officials and those who advise and assist them in the performance of their manifold duties." *United States v. Nixon*, 418 U.S. 683, 705 (1974). Accordingly, the executive privilege recognizes the "right of the President and high-level executive branch officers to withhold information from Congress, the courts, and ultimately public." Mark J. Rozell, *Executive Privilege and the Modern Presidents: In Nixon's Shadow*, 83 Minn. L. Rev. 1069, 1069-70 (1999).

In particular, the courts recognize two forms of executive privilege: the deliberative process and the presidential communications privilege. The deliberative process privilege "protects the deliberations and decision[-]making process of executive officials generally." *In re Sealed Case*, 121 F.3d at 735. In order for the deliberative process privilege to be invoked two requirements must be met: (1) the material must be pre-decisional; and (2) the material must be deliberative. *Id.* at 737. These requirements stem from the privilege's ultimate purpose—to "prevent injury to the quality of agency decisions" by ensuring that government officials are free to debate alternative approaches in private. *N.L.R.B. v. Sears Roebuck & Co.*, 421 U.S. 132, 151 (1975); *see also Nixon*, 418 U.S. at 705 (noting that "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision[-]making process").

The Supreme Court has also recognized the importance of protecting communications between "high Government officials and those who advise and assist them in the performance of their manifold duties." *Nixon*, 418 U.S. at 705. Thus, the presidential communications

privilege protects from disclosure (1) communications that are made by the President directly and (2) communications made by his immediate advisors in the Office of the President. *See Nixon*, 418 U.S. at 708 ("A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions, and to do so in a way many would be unwilling to express except privately."); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 450 (1977) ("*Nixon v. AGS*" or "*AGS*") (recognizing that the presidential communications privilege applies to communications made "in performance of the president's responsibilities of his office, in the process of shaping policies, and making decisions" (internal quotations omitted)). This privilege, while not absolute, also encompasses "communications made by presidential advisers in the course of preparing advice for the President . . . even when these communications are not made directly to the President" and "communications authored or received in response to a solicitation by members of a presidential adviser's staff*." In re Sealed Case,* 121 F.3d at 752. The presidential communications privilege is considered a "presumptive privilege" because it is "is fundamental to the operation of Government[.]" *Nixon*, 418 U.S. at 708.

Here, Plaintiff does not contend that documents marked as "personal" should be simultaneously protected by executive privilege.[6] Rather Plaintiff raises executive privilege as an alternative basis for non-disclosure. Specifically, even if the Court were to disagree with

---

[6] The Government's first argument against the assertion of executive privilege pertains to documents that the Government agrees are personal records. ECF 150 at 5. But the Government's acknowledgment of this fact appears to be based on a flawed interpretation of the PRA. Designating documents as Presidential or personal is not a matter of reviewing the documents; rather, outside the context of litigation brought by NARA, the only individual with authority to designate documents is the sitting President during whose presidency the documents were originated or were received.

President Trump and conclude that he did not have the authority to designate the documents at issue as personal under the PRA, which would contravene the law and settled precedent, the documents still may not be utilized by the Government because they are privileged. Simply put, assuming *arguendo* that the documents were not designated as personal documents during Plaintiff's presidency, they should be considered Presidential documents shielded by executive privilege.   With this framework in mind, Plaintiff asserts the following in response to the Global Issues raised by the parties.

**A. Plaintiff, as a former President, maintains the power to assert executive privilege.**

In its letter dated October 20, 2022, the Government suggests that Plaintiff cannot assert the deliberative process privilege.   ECF 150 at 5.   But substantial precedent indicates that President Trump has the authority to exercise this privilege.

First, the Supreme Court has explicitly rejected the notion that a former president may not invoke the presidential communications privilege to shield communications that occurred during his Presidency. *Nixon v. AGS*, 433 U.S. at 439 ("We reject the argument that only an incumbent President may assert such claims [of executive privilege."). In fact, in his Order denying review of an application for stay of mandate and injunction, Justice Kavanaugh wrote that "[a] former President must be able to successfully invoke the [p]residential communications privilege for communications that occurred during his Presidency . . . [because] concluding otherwise would eviscerate the executive privilege for [p]residential communications." *Trump v. Thompson*, 211 L.E.2d 579, 680 (2022). In doing so, Justice

Kavanaugh expressly rejected a decision of the U.S. Court of Appeals for the D.C. Circuit reasoning that "a former President may not successfully invoke the [p]residential communications privilege for communications that occurred during his Presidency, at least if the current President does not support the privilege claim." *Id.*

Although Justice Kavanaugh's Order explicitly addressed only the presidential communications privilege, his reasoning extends to a former President's assertion of the deliberative process privilege. The fundamental reasons for the presidential communications privilege—i.e., the need for candor in the President's decision-making processes—***also*** underlie the deliberative process privilege. Both privileges are premised on the notion that continuing confidentiality is necessary to "prevent injury to the quality of agency decisions" by ensuring that government officials are free to debate alternative approaches in private. *Sears Roebuck*, 421 U.S. at 151. As noted by Justice Kavanaugh, the failure to recognize a former President's assertion of the presidential communications privilege would undermine the important purposes served by the doctrine. Similarly, the refusal to recognize a former president's assertion of the deliberative process privilege would result in evisceration of the privilege's protection. Simply put, the candor with which a President conducts internal deliberations would be severely inhibited by the threat that those processes could be disclosed to the public by the President's successor.

The Supreme Court recognized these principles in *Nixon v. AGS*, in which the Supreme Court adopted the Solicitor General's argument that protection of a former President's assertion of executive privilege is essential to the democratic process. 433 U.S. at 448-49. In support of this argument, the Solicitor General explained the following:

14

> Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic. Therefore the privilege survives the individual President's tenure.

*Id.* (quoting Br. for Federal Appellees 33).

Although the Court in that case ultimately rejected the former President's claim of executive privilege given the "limited intrusion" imposed by the requirements of the now-superseded Presidential Recordings and Materials Preservation Act, it nevertheless recognized the importance of a former president's ability to assert executive privilege. *Id.* at 449. Nowhere in its opinion did the Court draw a line distinguishing the presidential communications privilege from the deliberative process privilege.

**B.    Plaintiff may assert a claim of executive privilege against the executive branch.**

In its October 20 letter, the Government also asserts that "Plaintiff may not assert the Executive Branch's privilege to withhold documents from itself."   ECF 150 at 5; *see also* ECF 48 at 23 (interpreting *Nixon v. AGS* to stand for the proposition that "a former President may not successfully assert executive privilege 'against the very Executive Branch in whose name the privilege is invoked'" (quoting *Nixon v. AGS*, 433 U.S. at 447-48)). The Government's argument is misplaced, because it relies on cherry-picking of language from the *Nixon* opinion without including the required context. Accordingly, the Government's reliance on *Nixon v. AGS* is inapposite, and the President may assert executive privilege against other members or agencies of the executive branch.

In *Nixon v. AGS*, the Court addressed the constitutionality of the Presidential Recordings and Materials Preservation Act (the "Act"), which directed an official of the executive branch to take custody of former president Nixon's presidential papers and tape recordings in order to (1) promulgate regulations that provided for the orderly processing and screening of the materials and (2) determine the terms and conditions upon which public access may eventually be had to those materials. 433 U.S. at 429. The Court rejected President Nixon's argument that the Act violated the separation-of-powers doctrine, noting that such an argument would succeed only when congressional action "prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* at 443. The Court held that because the Act provided for review of the materials by a member of the executive branch, it was "clearly less intrusive" than screening of the documents by Congress or some outside agency. *Id.* at 444.

Importantly, *Nixon v. AGS* does ***not*** stand for the proposition that a former president may not assert a claim of executive privilege against the executive branch. Rather, the case merely addressed whether President Nixon's separation-of-powers argument could succeed when the statute at issue required only limited intrusion into the executive branch's function by another member of the executive branch.

The facts of *In re Sealed Case* are more analogous to those at issue here. 121 F.3d 729. In that case, the Office of Independent Counsel ("OIC") subpoenaed the White House Counsel, seeking documents pertaining to the White House Counsel's investigation of the former Secretary of Agriculture. 121 F.3d at 734-35. The White House Counsel responded to the subpoena but asserted executive privilege with regard to 84 documents. *Id.* at 735. The

court concluded that the presidential privilege applied to the subpoenaed documents authored by the White House Counsel and, accordingly, permitted the White House Counsel's assertion of executive privilege against the OIC. *Id.* at 757-58. Although the court ultimately found that the OIC demonstrated a "sufficient showing of need to obtain certain information in some of the documents," the case illustrates the bounds within which a member of the executive branch may assert executive privilege. *Id.* at 757.

Although executive privilege is an important tool in preserving the independence of each branch of government pursuant to the doctrine of separation of powers, it is not limited to that purpose as the Government contends. *In re Sealed Case* illustrates that there is no prohibition against an executive's assertion of privilege during an investigation authorized by the Department of Justice. Rather, the purpose of the executive privilege is to preserve the confidentiality of executive deliberations—regardless of who seeks access to the privileged information. To hold otherwise would undermine a President's critical need to have candid deliberations in the turbulent waters of presidential decision-making.

### C.    The Government has not demonstrated a specific need that would overcome Plaintiff's assertion of privilege.

Although crucial to the executive branch's decision-making processes, executive privilege is neither absolute nor unqualified. *Nixon*, 418 U.S. at 706. Rather, the Supreme Court has recognized that the privilege must "yield to the demonstrated, specific needs for evidence in a pending criminal trial." *Id.* at 713. In providing this standard, the Supreme Court clarified that in order to overcome an assertion of executive privilege, the party seeking the privileged material must "clear three hurdles: (1) relevancy; (2) admissibility; and (3) specificity." *Nixon*, 418 U.S. at 700. The Supreme Court again affirmed this standard in *Cheney*

*v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 386 (2004).

Currently, the affidavit in support of the search warrant which authorized the search of Mar-a-Lago is under seal, and, therefore, inaccessible to Plaintiff. Plaintiff is therefore unaware of the specific arguments relied upon by the Magistrate in issuing the warrant authorizing seizure of the documents at issue. Given that, Plaintiff must take the position that the Government has failed to clear the three hurdles articulated by the Court in *Nixon*.

Given the circumstances, Plaintiff will reserve further argument until after it has received the Government's briefing on the global issue.

### III.   Plaintiff should not be required to submit a declaration concerning the Government's itemized receipt at this stage.

Finally, the Special Master has directed the parties to address "[w]hether Plaintiff should be required to file a declaration or affidavit regarding the government's inventory." ECF 161-1 at 1.   In short, there is no basis for requiring Plaintiff to submit such a declaration.

The Government conducted a sweeping, overly broad search of Plaintiff's property and seized a host of materials, including (as noted) ███████████████████████████

███████   Given that the Government possessed the materials, it made sense for the Government to describe the contents of the seized items, as demonstrated in the series of inventories filed pursuant to Rule 41(f) of the Federal Rules of Criminal Procedure.   Plaintiff, on the other hand, does not possess these materials.   As to the documents that the Government asserts include a classification marking, the Government has not allowed Plaintiff to review these items. Obviously, without a review of the documents, no one is in a position to "vouch" for the location of these documents on August 8, 2022.

Finally, when Judge Cannon issued an Amended Case Management Plan on

September 29, 2022, she specifically rejected the need for the Plaintiff to make any such certification. Nothing has changed to warrant reconsideration of that ruling.

## CONCLUSION

In moving forward with its seizure of materials from President Trump, the Government ignored established precedent concerning the President's right and responsibility for designating documents under the PRA, and it further disregarded a former President's authority to assert executive privilege with respect to certain materials. Given that President Trump classified these documents as personal records under the PRA, the Government's approach in this matter has been wholly deficient—replacing the statutory scheme for the review of designation decisions with unfounded criminal measures. The PRA permitted President Trump to designate documents as personal records while he was President, which he did. In the event the Special Master disagrees with this fact, long-established past precedent supports President Trump's assertion of executive privilege as to certain materials. Lastly, there is little basis for requiring Plaintiff to submit an affidavit concerning the seized materials, as it was the Government—not Plaintiff—that took custody of them and has maintained exclusive control over any and all documents with classified markings.

Dated: November 8, 2022                    Respectfully submitted,

                                           */s/ Lindsey Halligan*
                                           Lindsey Halligan
                                           Florida Bar No. 109481
                                           511 SE 5th Avenue
                                           Fort Lauderdale, FL 33301
                                           Email: lindseyhalligan@outlook.com

                                           James M. Trusty
                                           Ifrah Law PLLC
                                           1717 Pennsylvania Ave. NW, Suite 650

19

Washington, D.C.   20006
Telephone: (202) 524-4176
Email: jtrusty@ifrahlaw.com

Christopher M. Kise
Chris Kise & Associates, P.A.
201 East Park Avenue, 5th Floor
Tallahassee, FL 32301
Telephone: (850) 270-0566
Email: chris@ckise.net

M. Evan Corcoran
Silverman Thompson Slutkin White, LLC
400 East Pratt Street – Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Email: ecorcoran@silvermanthompson.com

*Counsel for Plaintiff Donald J. Trump*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on November 8, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Lindsey Halligan*
Lindsey Halligan
